Sylvester TURNER, Petitioner,

v.

KTRK TELEVISION, INC. and Wayne Dolcefino, Respondents.

No. 99–0419.

Supreme Court of Texas.

Argued Feb. 16, 2000.

Argued March 1, 2000.

Decided Dec. 21, 2000.

Ronald G. Franklin, Franklin Cardwell & Jones, Ralph S. Carrigan, Robert E. Lapin, Carrigan Lapin & Landa, Houston, for petitioner.

David T. Moran, E. Leon Carter, Charles L. Babcock, Robert P. Latham, Jackson Walker, Houston, for respondents.

Chief Justice PHILLIPS delivered the opinion of the Court, joined by Justice ABBOTT and Justice GONZALES, and joined by Justice ENOCH, Justice BAKER, and Justice HANKINSON in all Parts except Part III, and joined by Justice HECHT and Justice OWEN in all Parts except Part II.

This public-figure libel case raises two issues. First, we must decide whether a public figure can sue for defamation based on a publication as a whole, rather than by specific false statements. Second, we must determine whether Wayne Dolcefino, a reporter for KTRK Television, acted with actual malice in broadcasting a report questioning whether state representative and then Houston mayoral candidate Sylvester Turner was involved in a multi-million-dollar insurance scam. We hold that Turner established that the broadcast as a whole was false and defamatory, but that he failed to present clear and convincing evidence of actual malice. Therefore, we affirm the judgment of the court of appeals but for reasons different from those in that court's opinion. 987 S.W.2d 100.

## I

We first discuss the background for this case, presenting the evidence in the light most favorable to the jury's verdict. During the events at issue, Turner was a partner in the Houston law firm of Barnes, Morse, and Turner. In late 1985, Turner's life-long friend Dwight Thomas introduced him to Sylvester Foster, who owned several beauty salons and a male modeling studio in Houston. In April 1986, Foster discussed preparing a will with Turner. Turner and an associate worked on the will in May and June, making several changes at Foster's behest. The will placed the bulk of the estate assets, including the proceeds of all life insurance policies benefitting the estate, into a trust for the benefit of Foster's father, Clinton Foster, with Thomas designated as the trustee and executor. The duration of the trust was eleven years, after which the corpus would be distributed to Clinton Foster; however, if his father died before the trust terminated, the will provided that the corpus would pass immediately to Foster's girlfriend, Christina Batura. The will was completed and ready for execution on June 16.

In the months before executing the will, Foster was in trouble with the law. In March, he was indicted in Nevada on federal credit card fraud charges. The next month, he was arrested in Nevada for driving Thomas's car, which Thomas had reported stolen, allegedly as part of a "chop-shop" scheme in which Foster would sell the car, and Thomas and Foster would share the insurance money. Finally, in June, Foster was indicted by a Houston grand jury, also on federal credit card fraud charges. When Turner drafted the will, he knew about the April 8 arrest, but he did not know about any "chop-shop" scheme or either of the federal indictments.

Also unbeknownst to Turner, Foster, who already had a sizable amount of life insurance, began acquiring more in May and June. In total, by mid-June Foster had approximately $1.7 million in life insurance, with $875,000 directly benefitting the estate.[1] He also took out credit life on

---

1. Under the terms of the other policies, Clinton Foster individually would receive $330,000, Foster's business partner Reinders would receive $150,000 ($300,000 in case of accidental death), and Thomas would receive $500 a month with a guaranteed minimum of $120,000. The beneficiary designation on Thomas's policy was not clear whether it benefitted him individually or as trustee. Foster also applied for another one million dollar life

cars and jewelry that he purchased in May and June.

On the evening of June 18, Secret Service agent Jay Bly approached Foster to arrest him on the June Houston grand jury indictment. Foster promised Bly that he would turn himself in the following morning. He did not do so. Instead Foster went the next day to Turner's office where he signed his will. Turner was not present when Foster signed the will; Turner's secretary and a partner witnessed its execution. Three days later, Foster was reported to have drowned during a sailing trip. No body was found, but Keith Anderson and Russell Reinders, who were on the boat with Foster, both swore in affidavits that Foster fell overboard. On June 28, Foster's father, Clinton Foster, and Thomas met with Turner and asked that he probate the will. Turner agreed and the next month sent letters notifying several life insurance companies of Foster's death. In August, the Coast Guard issued a formal report claiming that Foster "was presumed drowned and lost at sea." On November 21, 1986, Turner filed an application to probate the will. Three weeks later, Prudential Insurance Company, which had a policy benefitting Foster's business partner Reinders, intervened to dispute Foster's death. The parties began discovery and took depositions from many witnesses, including Agent Bly, Turner, Thomas, and Batura.

In July 1987, Clinton Foster's attorneys moved to disqualify Turner because, as the will's drafter, he was likely to be a material witness. The probate judge, the Honorable Judge John Hutchison, disqualified Turner until the issue of Foster's death was resolved. Judge Hutchison also named Richard Snell as the estate's temporary administrator and instructed him to investigate Foster's death. Turner later submitted a bill of $28,000 for his representation of the estate, but Snell rejected it.

At Snell's request, Judge Hutchison appointed Elizabeth Colwell to investigate Foster's death. Colwell was paid by Clinton Foster's Kansas City attorney, Carston Johannsen. After searching for nearly two years, Colwell could not locate Foster. Accordingly, on April 12, 1989, Judge Hutchison declared Foster dead. Over a year later, however, the United States Embassy in Spain informed Clinton Foster that his son was alive and in a Spanish prison on drug charges. The probate court then rescinded its declaration of death and closed the estate.

Meanwhile, Turner pursued a successful political career. After winning election to the Texas House of Representatives in 1988 and 1990, Turner announced his candidacy for mayor of Houston in June 1991. To establish residency, Turner shared a house inside the city limits with Thomas. In November 1991, Turner won a spot in the December 7 mayoral run-off with financier Bob Lanier.

On November 27, the Wednesday before Thanksgiving, private investigator Clyde Wilson called KTRK anchor Shara Fryer. Wilson told Fryer of a possible connection between Turner and the Foster insurance swindle. Wilson also referred Fryer to two other private investigators, Peary Perry and Bill Elliott. Elliott had been hired by Turner's estranged wife Cheryl to investigate Turner in connection with their pending divorce. Perry was a former policeman who served on Lanier's finance committee.

After talking to KTRK news director Tom Doerr, Fryer passed on Wilson's tip to reporter Wayne Dolcefino. Dolcefino talked to Wilson for less than five minutes and later talked to Elliott, who told him that he knew of no evidence linking Turner to an insurance scam. Elliott also referred Dolcefino to Colwell. After talking with Elliott, Dolcefino had lunch with Perry. Perry gave Dolcefino a one-page memo discussing the Foster insurance swindle and Turner's connection to it.

insurance policy, but never took the physical exam required for it to take effect.

Perry told Dolcefino that he was a Lanier supporter and had people working on getting the probate court records.

Twenty minutes after Dolcefino returned to the station, he received a package of probate court documents, apparently from Perry. These documents included pleadings, Clinton Foster's motion to disqualify Turner, the order disqualifying Turner, depositions from Turner, Bly, and the Coast Guard officer who investigated Foster's "death," Turner's fee application and its denial. Although Foster's will was not included in these documents, Turner's deposition described the will's provisions in detail.

On Thanksgiving day, Dolcefino went with a camera crew to the house shared by Turner and Thomas. Dolcefino interviewed each man separately on camera. Both denied any knowledge that Foster was alive or of insurance fraud. In the following two days Dolcefino spoke with several people about Turner's involvement in the Foster matter. One of these people was Colwell, with whom he spoke on the phone twice, the first time for about five to ten minutes and the second time only briefly. Dolcefino also spoke with Clinton Foster's lawyer, Carston Johannsen, who told him that he knew of no public information suggesting Turner's involvement in an insurance scam. Johannsen also told Dolcefino that Turner's bill had been rejected because Turner had not timely filed it. Dolcefino taped another interview with Turner on Friday at the KTRK studios, and Turner once again denied any involvement in an insurance scam.

KTRK first aired the story on December 1, six days before the runoff. On KTRK's 5:30 p.m. newscast, anchor Bob Boudreux began:

We begin tonight with word of what may be one of the biggest attempted insurance swindles in recent Houston history, the apparent conspiracy to fake the death of a 30 year old Houston man with criminal troubles and millions of dollars in life insurance. Tonight, Wayne Dolcefino with his Thirteen Exclusive undercover investigation into a mystery with an explosive political twist.

Dolcefino continued:

That's right, Bob, because among the questions: What role did Houston mayoral candidate Sylvester Turner play in this tale of multi-million dollar fraud? We have been investigating Turner's role in this attempted insurance swindle since we first heard about it on the day before the Thanksgiving holiday. Our focus, what did Sylvester Turner know and when did he know it?

Dolcefino then described Foster's attempt to fake his death, identified Thomas as Foster's closest friend in Houston, and showed Thomas denying any knowledge that Foster was alive. Dolcefino's voice-over continued: "We found Thomas at his home in Inwood Forest, a home he shares with mayoral candidate Sylvester Turner.... The candidate claims the news about Foster was news to him too."

Dolcefino's narration continued: "Both Dwight Thomas and Sylvester Turner were deeply involved in the Sylvester Foster case and the attempt to get life insurance companies to pay off 6.5 million dollars in the wake of the disappearance. But did they know it was all a hoax, a scheme to swindle millions?" Thomas was then shown denying that he and Turner would have dealt with Foster had they known of any illegality. "But," Dolcefino stated, "Thomas and Turner did deal with Sylvester Foster, even after learning he was the target of criminal investigations in early 1986, and they pursued the estate money even after significant evidence of a possible scam in Foster's death had already surfaced." According to Dolcefino, "in June 1986 Turner drew up a will for Foster, the timing interesting." Foster was then indicted "for massive credit card fraud" on June 13. Dolcefino continued: "On June 19th, Foster rushed to sign the will in Turner's office, leaving the next day for a sailboat trip in the Gulf despite what

friends called his fear of the water. June 22nd, nine days after the indictment, three days after drawing up the will, Foster supposedly falls off the boat in another boat's wake and drowns."

Then, according to Dolcefino, "Turner began the legal effort to get the millions in insurance money released and get mutual friend, Dwight Thomas, appointed as administrator of the estate." Dolcefino further claimed that Thomas at first denied seeking control of the estate, but court documents showed that "[i]n fact, Thomas petitioned the court to become administrator." Following this, Dolcefino alleged that Turner "tried to block" questioning of Batura, who had died in an airline crash two years earlier. He further noted that Secret Service officers later determined that Batura had known of Foster's phony death. After charging Thomas with threatening witnesses in the Foster matter, the story shifted back to Turner's handling of the probate case. The broadcast stated that "Turner pursued the estate case for over a year, until a judge removed him from the case over Turner's protest, citing conflicts of interest." It then noted, without explanation, that Turner's bill had been rejected.

The broadcast then showed Turner claiming that he was a victim of Foster's scheme and had been "left with the bill" for his legal work. "But," continued Dolcefino, "if that's true, then Sylvester Turner was duped by overwhelming evidence and at least two legal clients with close ties to one of his closest friends." In conclusion, Dolcefino noted that "Sylvester Turner claims he fully cooperated with all of the investigations into Foster's disappearance, but at least three investigators close to the case tell us that's simply not true."

Immediately after the broadcast, Turner called an 8 p.m. press conference at which he introduced Judge Hutchison and Prudential's counsel in the Foster probate matter, Jim McConn. McConn stated that Turner's conduct was "not other than professional" and that he never believed that

Turner had done anything inappropriate. Judge Hutchison described the report as "fairly ridiculous" and said that Turner's conduct in the Foster probate matter was above reproach. Turner called the story "factually false, malicious, misleading" and untrue. He also suggested that the story came from the Lanier campaign.

KTRK reporter Mary Ellen Conway returned to the station with notes and a videotape of the news conference. Conway briefed Dolcefino on the press conference and then went to tape a response from Craig Varoga, Lanier's campaign manager. Meanwhile, Dolcefino screened at least some of the video of the news conference, then prepared an addendum for the 10 p.m. news. After rebroadcasting the earlier story, anchor Boudreux added that Turner had called a news conference to attack the story's allegations as false and misleading. The station then aired a clip of Turner stating that the story represented "an all-time low in Houston politics." Boudreux also stated that Turner claimed that the Lanier campaign had "hand-delivered" the story. The broadcast then cut to a clip of Varoga stating: "I think it's ridiculous that every time there's a story in the newspaper or on TV that raises serious questions about Sylvester Turner's public record, that he blames the Bob Lanier campaign." Then, reading from a script that Dolcefino had prepared, Boudreux stated that "KTRK and Wayne Dolcefino stand by the story." The station did not air or mention Hutchison's and McConn's comments.

Before the broadcast, polling conducted by political scientist Dr. Richard Murray for the *Houston Chronicle* showed Turner running slightly ahead of Lanier. The day after the broadcast, Turner dropped ten points in the same polling. In the following days, a controversy raged over the story's source. In the midst of this controversy, Doerr asked Clyde Wilson to come forward as the story's "tipster." Although Wilson had originally informed Fryer of a connection between Turner and Foster, he

had provided little useful information for the story. On Thursday, December 5, two days before the election, anchor Shara Fryer stated on KTRK's 5:30 p.m. broadcast that "Today in a surprise move, the real source of the story stepped forward. Clyde Wilson dropped a bombshell today by admitting that he leaked the story to Channel 13." After introducing Wilson as the story's source, Fryer added, "Sylvester Turner refused to apologize to Bob Lanier today, though Turner had accused the Lanier campaign of providing the information contained in the Eyewitness News report." On Saturday, December 7, Turner lost the election, drawing 46.94% of the vote to Lanier's 53.06%.

Turner brought this suit alleging that Dolcefino libeled him in the broadcasts and that Dolcefino's employer, KTRK, had authorized and ratified his conduct. The jury returned a verdict for Turner, assessing actual damages of $550,000 and exemplary damages of $4,500,000 against KTRK and $500,000 against Dolcefino. The trial court rendered judgment for Turner, but reduced KTRK's exemplary damages to $ 2.2 million under the statutory cap then applicable. *See* Act of June 16, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 46, *amended by* Act of April 20, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 111. The court of appeals reversed and rendered judgment for defendants, holding that Turner did not present clear and convincing proof that Dolcefino or KTRK acted with actual malice. 987 S.W.2d 100.

## II

### A

■ We first consider Turner's claim that the broadcast as a whole presented a false and defamatory impression of events. Defendants argue that we need not address this theory because Turner waived it at a pre-trial hearing when his counsel stated that "having not pled it we could not or do not intend to rely on libel by implication to support a judgment in this case, period, end of discussion." But this statement came in the context of a discussion in which Turner's attorneys strenuously argued that the broadcast's "gist" was both false and defamatory. As Turner's counsel stated, "The issue is, Judge, whether or not the story, the gist of the story—G-I-S-T is substantially false." Turner's pleadings also alleged that "the gist of the broadcast is substantially false and defamatory." These statements make clear that Turner intended to rely on the theory that the broadcast as a whole falsely defamed him, and that he regarded libel by implication as a separate theory.

■ We also reject defendants' argument that the jury charge, to which Turner did not object, does not allow Turner to recover on this theory. The charge instructed the jury to "consider the actual language used in the broadcasts as it relates to Sylvester Turner when taken as a whole, as opposed to any implied statements or inferences, and only consider the broadcasts in light of the surrounding circumstances." KTRK claims that because the charge instructed the jury to consider the broadcast's "actual language" and not "implied statements or inferences," the jury could only consider whether the broadcast's individual statements were true and could not consider whether the broadcast as a whole created a false and defamatory impression. But the language instructing the jury to consider the publication "as a whole" and "in light of the surrounding circumstances" refutes KTRK's claim that the jury could only consider the broadcast's individual statements in isolation. On the contrary, this language *required* the jury to consider whether these statements in combination created a false and defamatory impression, either by omitting material facts or misleadingly juxtaposing events.[2] The jury

---

2. In fact, KTRK complained in the court of appeals that the charge was defective for the very reason that it allowed the jury to consider the entire broadcast, rather than limiting

was therefore allowed to consider this theory.

## B

Defendants next argue that Texas law does not recognize a cause of action for defamation based on a publication as a whole. We disagree. We have long held that an allegedly defamatory publication should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it. *See, e.g., Musser v. Smith Protective Servs.*, 723 S.W.2d 653, 655 (Tex.1987); *Guisti v. Galveston Tribune Co.*, 105 Tex. 497, 150 S.W. 874, 878 (1912); *see also Kapellas v. Kofman*, 1 Cal.3d 20, 81 Cal.Rptr. 360, 459 P.2d 912 (1969)(en banc) (publication should be viewed " 'not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural probable effect on the mind of the average reader.' " (citations omitted)). Whether a publication is capable of a defamatory meaning is initially a question for the court. *See Musser*, 723 S.W.2d at 655. But when a publication is of ambiguous or doubtful import, the jury must determine its meaning. *Id.*

Because a publication's meaning depends on its effect on an ordinary person's perception, courts have held that under Texas law a publication can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory. *See Golden Bear Distributing Sys. v. Chase Revel, Inc.*, 708 F.2d 944, 948–49 (5th Cir.1983)(applying Texas law); *Express Publ'g. Co. v. Gonzalez*, 350 S.W.2d 589, 592 (Tex.Civ.App.—Eastland 1961, writ ref'd n.r.e.); *see also Huckabee v. Time Warner Entertainment Co.*, 19 S.W.3d 413, 425 (Tex.2000)("A broadcaster's omission of facts may be actionable if

their consideration to individual statements. Based on our discussion below, we find this

it so distorts the viewers' perception that they receive a substantially false impression of the event."). In *Golden Bear*, plaintiff Golden Bear of Texas claimed to have been libeled by an *Entrepreneur* magazine article. The article focused on investment fraud allegations against two companies, Golden Bear of California and Golden Bear of Utah. The article also discussed the sales practices of Golden Bear of Texas, an independent company. *See Golden Bear*, 708 F.2d at 946–47. Although the article did not expressly state that Golden Bear of Texas defrauded investors, the Fifth Circuit nevertheless held that an ordinary reader could reasonably interpret the article in that way. *See id.* at 948. As that court explained, "[t]he basis of the libel lies in the juxtaposition of truthful statements about one company with truthful statements about the illegal operations of an independent company of the same name located in a different state." *Id.* Because an ordinary reader could interpret the article to accuse Golden Bear of Texas of fraud, the Fifth Circuit rejected the magazine's argument that the article was non-actionable because it contained only true statements. *See id.* at 949.

In *Gonzalez*, a newspaper reported that an appeals court had ruled against Gonzalez in a suit for fraud against him and a another defendant. Although each statement in the article was literally true, the article did not mention that the plaintiffs had dismissed Gonzalez from the suit before trial and that the court of appeals rendered judgment against him only because he had agreed to act as a surety for the co-defendant's costs. *See Gonzalez*, 350 S.W.2d at 590–91. As in *Golden Bear*, the court held that the article was actionable, reasoning that an article is not true if the reader receives an untrue impression by omission of material facts. *See id.* at 592.

claim to have no merit.

■ Golden Bear and *Gonzalez* illustrate that the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements. Many other courts have likewise recognized that while all the statements in a publication may be true when read in isolation, the publication may nevertheless convey a substantially false and defamatory impression by omitting material facts or suggestively juxtaposing true facts. *See, e.g., Crane v. Arizona Republic*, 972 F.2d 1511, 1523 (9th Cir.1992); *O'Brien v. Papa Gino's of Am., Inc.*, 780 F.2d 1067, 1073 (1st Cir.1986); *Church of Scientology v. Flynn*, 744 F.2d 694, 696 (9th Cir.1984); *Gannett Co. v. Re*, 496 A.2d 553, 558 (Del. 1985); *McCullough v. Cook*, 679 So.2d 627, 632–33 (Miss.1996); *Healey v. New England Newspapers, Inc.*, 555 A.2d 321, 326 (R.I.1989); *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419–20 (Tenn.1978); Keeton et al., Prosser & Keeton on Torts § 116, at 117 (Supp.1988). *But see Auvil v. CBS "60 Minutes,"* 67 F.3d 816, 822 (9th Cir.1995)(Washington law does not recognize defamation based on the whole of a broadcast). These cases represent the converse of the substantial truth doctrine. *See McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex.1990). Just as the substantial truth doctrine precludes liability for a publication that correctly conveys a story's "gist" or "sting" although erring in the details, these cases permit liability for the publication that gets the details right but fails to put them in the proper context and thereby gets the story's "gist" wrong. Keeton et al., *supra*, § 116, at 117 (Supp.1988).

KTRK contends, however, that this Court rejected the theory of defamation based on the whole of a communication in *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640 (Tex.1995). In *Randall's*, a grocery store manager claimed that other store employees slandered her when they stated, in an investigation of the manager's conduct, that she had taken a Christmas wreath from the store without paying for it. *Id.* at 646. Although the employees gave a true account of events, the manager claimed that an ordinary reader could falsely infer that she was dishonest from the publication as a whole. *Id.* While we rejected the plaintiff's claim, *id.*, we do not believe this case to be dispositive. *Randall's* simply held that a defendant cannot be held liable for presenting a true account of events, regardless of what someone might conclude from this account. *See id.* The case did not involve the omission of material facts or misleading presentation of true facts, which can render an account just as false as an outright misstatement. Unlike *Randall's*, the literal truth of each individual statement is not a defense in such cases. *See, e.g., Golden Bear*, 708 F.2d at 949.

■ Defendants also cite *Cain v. Hearst Corp.*, 878 S.W.2d 577 (Tex.1994). In *Cain* we rejected the false light tort because it largely duplicated defamation without that more established tort's procedural and substantive safeguards. *See id.* at 579–80. *Cain* did not limit a plaintiff's right to claim defamation from the whole of a publication; it merely prevented such a plaintiff from bringing a false light claim. Unlike false light, a plaintiff claiming defamation based on a publication as a whole must prove that the publication's "gist" is false and defamatory and that the publication is not otherwise privileged. *See id.* at 581–84 (delineating the differences between false light and defamation). We therefore reject KTRK's argument and hold that a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way. We thus disapprove of the language of these court of appeals cases to the extent that they hold or suggest otherwise. *American Broad. Cos. v. Gill*, 6 S.W.3d 19, 43 (Tex.App.—San Antonio 1999, pet. denied); *Evans v. Dolcefino,*

986 S.W.2d 69, 78 (Tex.App.—Houston [1st Dist.] 1999, no pet.); *KTRK Television, Inc. v. Fowkes*, 981 S.W.2d 779, 789 (Tex. App.—Houston [1st Dist.] 1998, pet. denied); *Hardwick v. Houston Lighting & Power Co.*, 943 S.W.2d 183, 185 (Tex. App.—Houston [1st Dist.] 1997, no writ).

█ Next, we consider whether Turner's status as a public figure prevents him from claiming that the broadcast as a whole defamed him. Two other states' high courts have held that the First Amendment interest of robust, uninhibited discussion prevents a public figure from claiming defamation based on the whole of a communication when all its individual statements are literally or substantially true. *See Schaefer v. Lynch*, 406 So.2d 185, 188 (La.1981); *Diesen v. Hessburg*, 455 N.W.2d 446, 451–52 (Minn.1990). Other courts have held that a public figure may not sue for defamation based on the publication as a whole unless it omits material facts. *See Strada v. Connecticut Newspapers, Inc.*, 193 Conn. 313, 477 A.2d 1005, 1012 (1984); *Locricchio v. Evening News Ass'n*, 438 Mich. 84, 476 N.W.2d 112, 130 (1991).

█ We respectfully reject the approach of these states. Nothing in the United States Supreme Court's jurisprudence precludes a public figure from claiming defamation based on a publication as a whole. *See* Marc A. Franklin & Daniel J. Bussel, *The Plaintiff's Burden in Defamation: Awareness & Falsity*, 25 WM. & MARY L.REV. 825, 849–50 (1984)(criticizing *Strada* and *Schaefer* ); *see also Crane*, 972 F.2d at 1523; *Cook*, 679 So.2d at 632–33 (both allowing public figures to bring such claims). The First Amendment does require that a public figure prove falsity. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). But the Supreme Court's two most recent defamation decisions suggest that courts should determine falsity for constitutional purposes based on the meaning a reasonable person would attribute to a publication and not on a technical analysis of each individual statement. In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Court rejected the proposition that the First Amendment protected all statements of opinion on issues of public concern. *See id.* at 18–20, 110 S.Ct. 2695. Instead, the Court held that falsity for constitutional purposes should be determined based on whether a statement carries a "provably false factual connotation." *Id.* at 18, 110 S.Ct. 2695. Like a statement of opinion, a publication may by omission or misleading juxtaposition connote false facts even though it does not state them directly. Even more on point, the Court in *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991), stated, albeit in dicta, that a quotation taken out of context "can distort meaning, although the speaker did use each reported word." *Id.* at 515, 111 S.Ct. 2419. In the same way, failing to place facts in their proper context can change the meaning of an event. Consistent with *Masson* and *Milkovich*, we therefore believe that the First Amendment allows a public figure to sue for defamation when a publication as a whole conveys a false and defamatory meaning either by omission or juxtaposition. A public figure already bears the substantial burden of proving actual malice by clear and convincing evidence. *See Bose Corp. v. Consumers Union*, 466 U.S. 485, 510–11, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). This requirement adequately protects the interest of free expression and robust debate. *See Casso v. Brand*, 776 S.W.2d 551, 557 (Tex.1989). We see no need, therefore, to impose an additional barrier to recovery not required by the United States Constitution.

█ Nor do we believe that the Texas Constitution erects such a barrier. Although we have recognized that the Texas Constitution's free speech guarantee is in some cases broader than the federal guarantee, we have also recognized that "broader protection, if any, cannot come at

the expense of a defamation claimant's right to redress." *Id.* at 556. Unlike the United States Constitution, the Texas Constitution expressly guarantees the right to bring reputational torts. *See* TEX. CONST. art. I, §§ 8, 13; *Casso,* 776 S.W.2d at 556; *Ex parte Tucci,* 859 S.W.2d 1, 19–23 (Tex.1993)(Phillips, C.J., concurring). The Texas Constitution's free speech provision guarantees everyone the right to "speak, write or publish his opinions on any subject, *being responsible for abuse of that privilege.*" TEX. CONST. art. I, § 8 (emphasis added). Likewise, the Texas Constitution's open courts provision guarantees that "[a]ll courts shall be open, and every person for an injury done him, in his lands, goods, person *or reputation,* shall have remedy by due course of law." TEX. CONST. art. 1, § 13 (emphasis added). While we have occasionally extended protections to defamation defendants greater than those offered by the United States Constitution, we have based these protections on the common law, not the Texas Constitution. *See Casso,* 776 S.W.2d at 556; *cf. Tucci,* 859 S.W.2d at 32 (Phillips, C.J., concurring)("[N]othing in the language or purpose of the Texas Free Expression Clause authorizes us . . . to afford greater weight in the balancing of interests to free expression than we would under the First Amendment. . . ."). We find nothing in Texas's common law or Constitution preventing a public figure from bringing a defamation action when, through omission or misleading juxtaposition, a publication as a whole conveys a false and defamatory message.

### C

■■■ We now determine whether the broadcast as a whole conveyed a false and defamatory message. As a preliminary matter, we discuss our standard of review for the falsity issue. Courts are divided on the burden that a public-figure plaintiff bears in proving falsity, and the United States Supreme Court has expressly reserved judgment on the issue. *Harte–Hanks Communications, Inc. v.*

*Connaughton,* 491 U.S. 657, 661 n. 2, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Some courts, as would Justice Hecht's dissent, have held that public figures must prove both actual malice and falsity by clear and convincing evidence. *Buckley v. Littell,* 539 F.2d 882, 889 (2d Cir.1976); *Firestone v. Time, Inc.,* 460 F.2d 712, 723 (5th Cir. 1972)(Bell, J., concurring). Others have held that public figures need only prove falsity based on a preponderance of the evidence. *Rattray v.. City of National City,* 51 F.3d 793, 801 (9th Cir.1994); *Goldwater v. Ginzburg,* 414 F.2d 324, 341 (2d Cir.1969). Although defendants argued in the court of appeals that the trial court erred in instructing the jury by a mere preponderance of the evidence, neither side has briefed or argued the burden of proof for falsity in this Court. Thus, we are unwilling on this record to require clear and convincing evidence of falsity. Instead, we assume without deciding that the trial court properly instructed the jury to determine falsity by a preponderance of the evidence, and we review the jury's verdict on both defamatory meaning and falsity under our traditional "no evidence" standard. Under that standard, we must hold for Turner on this point unless no reasonable jury could have found the broadcast to be false or defamatory. *See Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)(test for "no evidence" rule is whether reasonable minds could differ on an issue of vital fact); *see also Musser,* 723 S.W.2d at 654–55 (defamatory meaning only a question of law if reasonable minds cannot differ).

■■■ Applying the deferential "no evidence" standard of review, we hold that there is some evidence to support the jury's answer on the issue of falsity. We conclude that a reasonable fact-finder could determine that the broadcast, through omission of critical facts and juxtaposition of others, left a substantially false impression of Turner's actions as attorney for Foster and the estate. Based on this misleading account, a viewer could

reasonably believe that Turner participated in insurance fraud, especially in light of the broadcast's introduction, which purported to examine Turner's "role" in this "tale of multimillion dollar insurance fraud." We do not deny that even an accurate report may have raised troubling questions about Turner's association with Foster and Thomas. Such an account would not have been actionable. As we stated earlier, a true account which does not create a false impression by omitting material facts or suggestively juxtaposing them is not actionable, regardless of the conclusions that people may draw from it. *See Randall's*, 891 S.W.2d at 646. But by omitting key facts and falsely juxtaposing others, the broadcast's misleading account cast more suspicion on Turner's conduct than a substantially true account would have done. Thus, it was both false and defamatory. *See Re*, 496 A.2d at 558; *cf. McIlvain*, 794 S.W.2d at 16 (stating rule but reaching opposite conclusion).

Perhaps the broadcast's most misleading omission concerned Turner's actions as lawyer for Foster's estate. The broadcast informed viewers: "Despite the signs of something fishy, Sylvester Turner began the legal effort to get the millions in insurance money released and get mutual friend, Dwight Thomas, appointed as administrator over the estate." It did not mention that Foster's will named Thomas as independent executor. The broadcast then stated that Thomas "sought control of the estate" and "petitioned the court to become administrator."[3] Without knowing that Thomas was named as executor in the will, a reasonable viewer might take

these statements to mean that Turner and Thomas attempted to have Thomas appointed as administrator on their own volition. Although Turner's actions were those of any lawyer probating an estate, the broadcast's failure to place them in the proper context falsely suggested that Turner abused his position by handpicking his friend to handle an estate worth millions. The broadcast also failed to mention that Foster's father was the primary beneficiary of the will, the testamentary trust, and most of the life insurance policies. A reasonable viewer therefore might conclude, especially in light of the broadcast's claim that Thomas and Turner "pursued the estate money," that Turner sought to benefit personally from Foster's "death."[4]

Another segment could also suggest misleadingly that Turner acted unethically in representing the estate:

> Sylvester Turner pursued the estate case for over a year, until a judge removed him from the case over Turner's protest, citing conflicts of interest. In November of 1987 Turner tried to collect more than $28,000 in legal fees from the still unsettled estate for his work. The bill was rejected.

This statement was misleading in two ways. First, the only "conflict" Turner faced was that between his role as attorney for the estate and fact witness. *See* TEX.R. PROF. COND. 3.08. But in the context of the broadcast's suggestion that Turner attempted to place a close friend in control of a valuable estate, a viewer might reasonably believe that the "conflict of interest" was that between his own pecuni-

---

3. Thus, the problem with this statement was not, as defendants and the court of appeals suggested, that it merely referred to Thomas as the estate's "administrator," rather than its "executor ." 987 S.W.2d at 115 n. 17.

4. Comparing this conclusion to our conclusion, later in the opinion, *see infra* at 137, that Dolcefino's misunderstanding of the probate proceedings was not evidence of actual malice, Justice Hecht's dissent suggests that we expect the average viewer to have a better

understanding of probate proceedings than an investigative reporter. To the contrary, we are merely applying the different standards of proof and review for these issues. Falsity, we have assumed, need only be proven by a preponderance of the evidence, with the jury's determination reviewed by us under the traditional no evidence standard. Actual malice must be proven by clear and convincing evidence, and appellate courts must conduct an independent review of the record. *See infra* Part III.A.

ary interests and his duty to the estate. Second, the placement of the broadcast's discussion of Turner's fee suggested that it was rejected because of this "conflict of interest." The record is not clear why the temporary administrator rejected Turner's fee. Turner's probate expert, Judy Lennox, testified that the temporary administrator probably denied Turner's claim for fees because the estate was insolvent and because denying Turner's claim would start the ninety-day limitations period for Turner to sue the estate to recover his fees. *See* TEX. PROB.CODE § 313. Johannsen, on the other hand, told Dolcefino that Turner's claim was rejected because it was untimely filed. In any case, nothing in the record suggested that the temporary administrator rejected Turner's fee for reasons related to his disqualification.

The broadcast's description of Turner's work on Foster's will was also misleading. According to the broadcast, Turner "drew up" a will for Foster in June 1986, "the timing interesting." Then the broadcast stated that the Houston federal grand jury indicted Foster on June 13 for "massive credit card fraud" and that Foster "rushed to sign the will in Turner's office on June 19th." Dolcefino continued: "June 22, nine days after the indictment, *three days after drawing up the will,* Foster supposedly falls off the boat in another boat's wake and drowns." (emphasis added). Based on this description an ordinary viewer might believe that Turner drafted the will three days before Foster disappeared, when in fact Turner had been working on the will since May and was not even present when Foster signed the will on June 19. Under the impression that Turner drafted the will from scratch just days, rather than weeks, before Foster's disappearance, a juror could conclude that the will was more likely to be the product of a scheme to defraud insurers. To be sure, a careful listener might realize that the broadcast technically referred to Turner as "drawing up the will" in June, the timing of which was "interesting," and to Foster as rushing to sign it later that same

month, the day before leaving for the boat trip. But in all likelihood, most viewers would not distinguish between drafting and signing a will, particularly because the broadcast later referred to Foster's falling off the boat "three days after drawing up the will." *See Golden Bear,* 708 F.2d at 948 (defamatory meaning viewed from the standpoint of the "ordinary reader" and not the "literal reader"); *Rose v. Enterprise Co.,* 617 S.W.2d 737, 741 (Tex.Civ. App.—Beaumont 1981, writ ref'd n.r.e.)(fact issue regarding falsity when the "man on the street" could misconstrue article); *see also Forsher v. Bugliosi,* 26 Cal.3d 792, 163 Cal.Rptr. 628, 608 P.2d 716, 722 (1980)("courts must refrain from a 'hair splitting analysis' of what is said ... to find an innocent meaning...."). Indeed, KTRK employees themselves did not make this distinction. Based on Dolcefino's story, KTRK anchor Dave Ward reported the next day that "Turner ... drew up Foster's will three days before the disappearance...."

Because of these material omissions and misleading juxtapositions, we believe a reasonable viewer could conclude that the broadcast mischaracterized Turner's role in the Foster matter and thereby cast more suspicion on Turner's action than an accurate account would have warranted. We therefore hold that the broadcast as a whole conveyed a false and defamatory message.

### III

#### A

 Having determined that the broadcast as a whole could leave a false and defamatory impression, we must now consider the actual malice issue. Because the threat of a defamation judgment can chill discussion of public issues, the First Amendment requires Turner, as a public figure, to establish clear and convincing evidence of actual malice. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 285–86, 84 S.Ct. 710, 11 L.Ed.2d 686

(1964). To establish actual malice, a public figure must prove that the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. 710. In this context, "reckless disregard" means that the defendant "entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Although actual malice focuses on the defendant's state of mind, a plaintiff can prove it through objective evidence about the publication's circumstances. *See Herbert v. Lando*, 441 U.S. 153, 160, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *Frank B. Hall & Co. v. Buck*, 678 S.W.2d 612, 621 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e).

 Federal constitutional law dictates our standard of review on the actual malice issue, which is much higher than our typical "no evidence" standard of review. *See Bose*, 466 U.S. at 510, 104 S.Ct. 1949; *Doubleday & Co. v. Rogers*, 674 S.W.2d 751, 755 (Tex.1984). Under this standard, we must independently consider the entire record to determine whether the evidence is "sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Bose*, 466 U.S. at 511, 104 S.Ct. 1949. Because the trier of fact has the ability to examine the witness's demeanor, we must defer to its credibility determinations. *See Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678; *see also Parkins v. Texas Farmers Ins. Co.*, 645 S.W.2d 775, 778 (Tex.1983). Once we have resolved credibility questions in favor of the jury's verdict, however, we must independently evaluate " 'the statements in issue and the circumstances under which ·they were made to see ... whether they are of a character which the principles of the First Amendment ... protect.' " *Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678 (citations omitted)(omissions in original). It is not enough for us, therefore, to determine that a reasonable jury could have found that Dolcefino acted with actual malice. Beyond that, we ourselves must conclude that the evidence of malice is clear and convincing. *See Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1252 (9th Cir.1997).

Here, we analyze the actual malice issue in terms of both Turner's claim that the broadcast as a whole presented a false and defamatory impression of events and his claim that individual statements were false and defamatory. Applying the standard of review discussed above, we conclude that Turner has not presented clear and convincing evidence of actual malice.

**B**

 Our analysis in this case is complicated because Turner's claim rests primarily on the false and defamatory message created by the broadcast as a whole, not individual false statements. In this type of case, a public figure must present clear and convincing evidence that the defendant knew or strongly suspected that the publication as a whole could present a false and defamatory impression of events. *See Eastwood*, 123 F.3d at 1256 (actual malice requires that defendants know that language choice was misleading); *Newton v. National Broad. Co.*, 930 F.2d 662, 680 (9th Cir.1990)(defendant must know that the broadcast's arrangement of material created a false impression); *Huckabee*, 19 S.W.3d at 426 (plaintiff must show that defendant was aware that omission could create a substantially false impression). This rule stems from the actual malice standard's purpose of protecting innocent but erroneous speech on public issues, while deterring "calculated falsehoods." *Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). A publisher's presentation of facts may be misleading, even negligently so, but is not a "calculated falsehood" unless the publisher knows or strongly suspects that it is misleading.

Turner first argues that Dolcefino's decision to omit material favorable to Turner

establishes clear and convincing evidence of actual malice. From his investigation, Dolcefino knew the following facts: (1) Foster's will named Thomas as executor, (2) Turner's fee had been rejected merely because it was not timely filed, (3) Turner was disqualified only because of the likelihood that he would be a material witness in the will contest proceeding; (4) the insurance policies benefitted Clinton Foster, (5) Clinton Foster was the primary beneficiary of the testamentary trust, (6) Turner had been disqualified for over two years before Foster reappeared, and (7) Turner did not probate the will until the Coast Guard issued a formal report listing Foster as "missing and presumed drowned."

■ We have already discussed how at least the first five of these omissions created a false impression of Turner's representation of the Foster estate. For an omission to be evidence of actual malice, however, the plaintiff must prove that the publisher knew or strongly suspected that it could create a substantially false impression. *See Huckabee,* 19 S.W.3d at 426; *see also Perez v. Scripps–Howard Broad. Co.,* 35 Ohio St.3d 215, 520 N.E.2d 198, 204 (1988); *Dixon v. Ogden Newspapers, Inc.,* 187 W.Va. 120, 416 S.E.2d 237, 244–45 (1992). On this record, we cannot say that Dolcefino's failure to include these facts is clear and convincing evidence that he knew the broadcast would present a false impression or that he entertained serious doubts to that effect. It is not apparent from the record whether Dolcefino, as a non-lawyer, understood the significance of Foster's naming Thomas as executor or knew that his description of the reasons for Turner's disqualification was incomplete. *Cf. Time, Inc. v. Pape,* 401 U.S. 279, 292, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971)(failing to clarify that charges of police misconduct in a government report were merely allegations was not actual malice). Further, because of the upcoming election, the story was clearly "hot news." *Cf. Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 157–59, 87 S.Ct. 1975, 18 L.Ed.2d

1094 (1967). Dolcefino had only five days to research and write a complicated story, a primary source of which was court documents. Moreover, the story had to be edited to fit the time demands of a news segment. Dolcefino's failure to include all the relevant details regarding Turner's participation in the estate suggests negligence, but under these circumstances we cannot conclude that it establishes actual malice with convincing clarity. *See Huckabee,* 19 S.W.3d at 426.

■ Turner next points to the broadcast's misleading discussion of the timing of his work on Foster's will. According to Turner, the "gist" of this passage is that Turner "drew up" the will three days before Foster disappeared. Dolcefino, however, admitted at trial that no one had told him that Turner completed the will three days before Foster's disappearance. Therefore, Turner contends, Dolcefino included the passage on the timing of the will with the knowledge that it would create a false impression. But once again there is not clear and convincing evidence that Dolcefino knew or strongly suspected this. First, the segment indicates that "Turner drew up a will for Foster" in June. It then states that Foster "rushed to sign the will" the day before his trip. Finally, the broadcast refers to Foster "drawing up" the will three days before he disappeared. That a reasonable viewer could take the segment to mean that Turner "drew up" the will three days before Foster disappeared does not by itself establish clear and convincing evidence of actual malice. We agree that there was a discrepancy in the segment's language and that it is possible that Dolcefino cleverly manipulated this language to deceive viewers. But it is equally possible that Dolcefino simply failed to choose his words with proper precision, that is, by stating that Foster "drew up" rather than "signed" the will (outside of Turner's presence) three days before he disappeared. Because there is no other evidence that Dolcefino knew or strongly suspected that this seg-

ment would mislead viewers, its lack of clarity alone is not clear and convincing evidence of actual malice. *See Bose*, 466 U.S. at 513, 104 S.Ct. 1949 (merely because an intelligent speaker should have realized that a statement is inaccurate is not clear and convincing evidence of actual malice).

■■■■ Nor does the phrase "timing interesting" indicate actual malice. Even assuming that Turner began work on the will in May and finished the final draft on June 13, one still might find the timing of events "interesting." Moreover, because it does not connote a false fact, the "timing interesting" statement is protected as a statement of opinion. *See Milkovich*, 497 U.S. at 20, 110 S.Ct. 2695.[5]

■■■ Turner also points to KTRK station manager Doerr's testimony as evidence of actual malice. Doerr testified that in his opinion the story "implied that Turner was a knowing participant in an insurance fraud." This testimony, however, comes in the context of Doerr's testimony describing how, in editing the broadcast, he and Dolcefino were careful to report only what they knew to be factually true. Further, as we noted earlier, even an accurate broadcast would have raised serious questions about Turner's judgment in associating with Foster. We cannot say, therefore, that Doerr's testimony is clear and convincing evidence that either he or Dolcefino knew that the broadcast could create a false or misleading impression or had serious doubts about whether the broadcast could mislead viewers.

■■■ Next, Turner points to Dolcefino's decision not to air McConn's and Hutchison's comments from Turner's news conference as evidence of actual malice. Dolcefino testified at trial that he did not know about Hutchison's and McConn's

comments when he edited the tape and prepared the addendum to the 10 p.m. broadcast. But Mary Ellen Conway testified that she told Dolcefino the substance of Hutchison's and McConn's comments. Even disregarding Dolcefino's testimony, as we must, we do not conclude that Dolcefino's decision to omit the Hutchison and McConn footage is clear and convincing evidence of actual malice.

■■ As the court of appeals recognized, Hutchison and McConn did not dispute the truth of any specific statement in the broadcast. Turner, however, argues that Hutchison and McConn confirmed that the "gist"of the story—that Turner knowingly participated in an insurance fraud-was false. Dolcefino's failure to include their comments, he concludes, further confirms Dolcefino's intent to mislead viewers about Turner's actions concerning the Foster matter. But as we discussed above, there is not clear and convincing evidence that Dolcefino himself believed the story to be misleading. Because neither Hutchison nor McConn refuted specific facts in the broadcast, their general testimony concerning Turner's good character would not have alerted Dolcefino that the broadcast was false or misleading. *See Howell v. Hecht*, 821 S.W.2d 627, 631 (Tex. App.—Dallas 1991, writ denied). Libel law cannot require a news organization to air the interviews of everyone who might speak on a public figure's behalf. *See Levan v. Capital Cities/ABC, Inc. .*, 190 F.3d 1230, 1243 (11th Cir.1999), *cert. denied* 528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 118 (2000); *see also Miami Herald Co. v. Tornillo*, 418 U.S. 241, 258, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974)(state law requiring newspapers to allow political candidates a right of reply to negative editorials violated First Amendment). Dolcefino was entitled to edit his story to fit within the short time period allotted for

---

**5.** In its discussion of this passage, the court of appeals stated that statements of opinion are protected under the Texas Constitution. *See* 987 S.W.2d at 115–16. We express no opin-

ion whether the Texas Constitution affords greater protection to statements of opinions than *Milkovich*.

the broadcast. *See Peter Scalamandre & Sons, Inc. v. Kaufman,* 113 F.3d 556, 563 (5th Cir.1997). Faced with the choice of which material to include, Dolcefino may have simply believed that Turner's reaction and the Lanier campaign's response was more newsworthy than Hutchison's and McConn's general comments. Under these circumstances, we cannot conclude that Dolcefino's decision to omit Hutchison's and McConn's comments is clear and convincing evidence of actual malice.[6]

▮ Next, Turner contends that Dolcefino demonstrated actual malice by not revealing that one of his sources was connected to the Lanier campaign. Turner first claims that the 10 p.m. broadcast's statement that "KTRK and Wayne Dolcefino stand by the story" implicitly endorsed the Lanier campaign's denial that they planted the story. According to Turner, this shows actual malice because Dolcefino knew that one of his sources, Peary Perry, was aligned with the Lanier campaign. We agree that the "stand by the story" statement is ambiguous and could be taken as an endorsement of the Lanier campaign's position. But the statement may instead have been intended as a response to Turner's allegation that the story was false and misleading. As there is no evidence that Dolcefino intended to endorse the Lanier campaign's position, we do not believe that his silence on the 10 p.m. broadcast regarding the story's source is clear and convincing evidence of actual malice. The controversy over the source between the Lanier campaign and the Turner campaign was important news, and Dolcefino and KTRK were entitled to report it. That Dolcefino did not insert himself into the controversy by validating Turner's allegations does not, by itself, establish actual malice with convincing clarity.

▮ In a related argument, Turner claims that actual malice is evident in news director Doerr's decision on December 5 to produce Clyde Wilson as the story's "true source." The record is unclear whether Dolcefino told his superiors at KTRK about Perry and his political connections before they produced Wilson. Because nothing in the record links Doerr's decision to Dolcefino's thought processes, that evidence cannot support an inference regarding his state of mind. Moreover, it was not technically inaccurate to name Wilson as the source as he gave the initial tip to KTRK, although he provided few substantive details of the story. Dolcefino's conduct is simply not clear and convincing evidence of actual malice.

## C

▮ In addition to claiming that the broadcast as a whole defamed him, Turner also claims that several of the broadcast's individual statements were false and that Dolcefino knew that they were false or recklessly disregarded their truth or falsity. Like the court of appeals, we conclude that most of the broadcast's individual statements are literally true and that most of those not literally true are substantially true. *See* 987 S.W.2d at 114–17. For example, the broadcast falsely referred to $ 6.5 million dollars, when in fact Foster had only applied for approximately 1.7 million dollars in insurance, only $875,000 of which actually benefitted the estate. An average viewer, however, would not view a 1.7 million dollar insurance swindle—or even an $875,000 insurance swindle—with any less opprobrium than a 6.5 million dollar swindle.[7] *See McIlvain,* 794 S.W.2d at 16; *Fort Worth Press Co. v. Davis,* 96 S.W.2d 416, 419 (Tex.Civ.App.—Fort Worth 1936, writ ref'd). Likewise, Judge Hutchison's order did not "cite" conflicts

---

6. KTRK did air excerpts from Hutchison's and McConn's comments the next day.

7. We note, however, that as the estate was over $300,000 in debt, the net benefit to the estate would have been only about $575,000.

Contrary to the broadcast's introductory statement, this would likely not qualify as "one of the biggest attempted insurance swindles in recent Houston history."

of interest, as Dolcefino reported. We have already discussed how the "conflicts of interest" statement could mislead a reasonable viewer, but the fact that Judge Hutchison did not actually cite conflicts of interest does not make the statement any more defamatory. Similarly, the fact that Turner was "duped" by only one client, rather than two as the broadcast claimed, does not make the statement substantially false.

■ Turner particularly takes issue with the broadcast's statements that Turner and Thomas "pursued the estate money" and that Turner and Thomas were "deeply involved in the Foster case and the attempt to get insurance companies to pay off 6.5 million dollars in the wake of the disappearance." We have already discussed how the broadcast's omission of facts placing these statements in context may have misled viewers. But, as we explained above, Dolcefino's failure to include these facts is not, by itself, clear and convincing evidence of actual malice.

■ As for these statements themselves, we agree with the court of appeals that they are substantially true. As the lawyer for the estate, Turner was "involved" in the Foster case. Whether he was "deeply" involved is not objectively verifiable. Nor was it inaccurate to say that Turner "pursued" the insurance money. Turner sent letters to insurers notifying them of Foster's death and requesting that claim forms be sent to him. Even after Turner was removed from the case, a lawyer in Turner's office sent a letter to an insurance company on Turner's behalf seeking payment on a policy benefitting Thomas. Nor does broadcast's reference to the "estate money," instead of the in-surance money, make this statement sub-stantially false. As the court of appeals correctly observed, it would make little difference to the average viewer whether the assets were probate or non-probate. 987 S.W.2d at 114–15.

■ Unlike the court of court of appeals, however, we believe that the jury could have reasonably found the broadcast's assertion that Turner "blocked" Batura's questioning to be false.[8] But we do not believe that the record presents clear and convincing evidence that Dolcefino made this statement with actual malice. At trial, Dolcefino testified that both Colwell and Special Agent Bly told him that Turner had "blocked" Batura's questioning. Bly, however, did not testify at trial,[9] and Colwell's testimony was effectively impeached on cross-examination. Turner argues that if we disregard both Dolcefino's and Colwell's testimony, as the jury must have done, the evidence is clear and convincing that Dolcefino fabricated the "blocking" allegation.

■ But in *Bose*, the United States Supreme Court held that a witness's lack of credibility could not, by itself, establish clear and convincing evidence of actual malice. *See Bose*, 466 U.S. at 512, 104 S.Ct. 1949. Although it is clear that discredited testimony "does not rebut any inference of actual malice that the record otherwise supports, ... it is equally clear that it does not constitute clear and convincing evidence of actual malice." *Id.* Consistent with *Bose*, we have stated that "[i]t is not enough for the jury to disbelieve defendant's testimony. Rather the plaintiff must offer clear and convincing affirmative proof to support a recovery."

---

**8.** The only evidence in the record that remotely suggests this is a December 31, 1986 letter from Secret Service agent E. Neal Findley to Turner seeking to take Thomas's polygraph. The letter states merely that the Secret Service also wanted to give Batura a polygraph test. It did not indicate that the Service was having difficulty finding Batura or that they needed Turner's help in finding her.

**9.** The court of appeals mistakenly stated that Bly testified at trial. 987 S.W.2d at 116. Dolcefino admitted at trial that Bly had stated in his deposition that he did not remember whether he talked to Dolcefino before the broadcast.

*Casso,* 776 S.W.2d at 558. Turner argues that the Supreme Court in *Harte–Hanks* limited *Bose.* We disagree. Nowhere does *Harte–Hanks* state that a witness's lack of credibility can, by itself, establish clear and convincing evidence of actual malice. Rather, the Court in *Harte–Hanks* concluded there was clear and convincing evidence of actual malice only after considering the jury's rejection of defense witnesses' testimony *in combination with* undisputed affirmative evidence of actual malice. *See Harte–Hanks,* 491 U.S. at 690–91, 109 S.Ct. 2678 (emphasis added); *see also id.* at 681, 109 S.Ct. 2678 (actual malice not established merely by falsity); *Eastwood,* 123 F.3d at 1255 n. 12; *Newton,* 930 F.2d at 671. Because Turner has not presented clear and convincing affirmative proof that Dolcefino fabricated the blocking allegation, Colwell's and Dolcefino's lack of credibility does not establish actual malice.

■■■ Turner also claims that Dolcefino lied in stating that three investigators told him that Turner had not cooperated with investigations into Foster's death. Once again, we do not find clear and convincing evidence that Dolcefino made this allegation with actual malice. Dolcefino testified that Elliott, Colwell, and Bly had confirmed Turner's non-cooperation. Colwell's testimony was consistent with Dolcefino's story. Elliott testified, however, that he did not specifically tell Dolcefino that Turner had been uncooperative, but that Dolcefino "may have concluded that." We cannot conclude, however, the mere fact that one of three purported sources for an allegation denies specifically making it establishes clear and convincing evidence of actual malice. Further, as we explained above, Dolcefino's and Colwell's lack of credibility does not, by itself, prove actual malice with convincing clarity.

\* \* \*

We by no means condone Dolcefino's and KTRK's inaccurate reporting in this case. As we have discussed, the failure to place Turner's actions in their proper context may have misled viewers. But because "[v]igorous reportage of political campaigns is necessary for the optimal functioning of our democratic institutions and central to our history of individual liberty," *see Harte–Hanks,* 491 U.S. at 687, 109 S.Ct. 2678, the Supreme Court regards innocent but inaccurate reporting as a necessary evil. Moreover, out of an abundance of caution that libel law not trample public debate, the Supreme Court requires public figures to present clear and convincing evidence that an inaccurate report was other than innocent. *See Bose,* 466 U.S. at 510–11, 104 S.Ct. 1949. As Turner has not produced clear and convincing evidence that Dolcefino and KTRK knew the broadcast would mislead viewers, we must affirm the judgment of the court of appeals.

Justice HECHT filed an opinion concurring in the judgment but dissenting in part which Justice OWEN joined.

Justice BAKER filed an opinion concurring in part and dissenting in part which Justice ENOCH and Justice HANKINSON joined.

Justice O'NEILL did not participate.

### APPENDIX

### CHANNEL 13 NEWS BROADCAST

5:30 P.M. NEWS—December 1, 1991

BOB BOUDREUX:

Good evening everyone, and thank you for joining us.

We begin tonight with word of what may be one of the biggest attempted insurance swindles in recent Houston history, the apparent conspiracy to fake the death of a 30–year old Houston man with criminal troubles and millions of dollars in life insurance.

Tonight, Wayne Dolcefino with his 13 exclusive undercover investigation into a mystery with potential explosive political twist.

Wayne.

WAYNE DOLCEFINO:

That's right, Bob, because among the questions: What role did Houston mayoral candidate, Sylvester Turner, play in this tale of multi-million dollar fraud?

We have been investigating Turner's role in this attempted insurance swindle since we first heard about it on the day before the Thanksgiving holiday.

Our focus, what did Sylvester Turner know and when did he know it?

In loving memory, the obituary read.

It was June of 1986, and 30–year old Sylvester Clyde Foster, a male model and beauty salon owner, had died in a freak accident.

Two companions claimed Foster had fallen off a sail boat and into the waters of the Gulf of Mexico six miles south of Galveston.

The Coast Guard searched but the body was never found.

This week, 13 Undercover learned Sylvester Foster was very much alive and in prison in Salamanca, Spain, under an alias, Christopher Lauren Fostier.

Fostier had been arrested after allegedly delivering two kilos of cocaine to a Spanish undercover agent.

Dwight Thomas was said to be Foster's closest friend here in Houston.

We asked him on Thanksgiving morning about Foster's miraculous return from the grave.

DWIGHT THOMAS:

Prison, Spain?

SPEAKER:

Uh-huh.

DWIGHT THOMAS:

Prison, Spain?

Prison, Spain?

SPEAKER:

Sylvester Clyde Foster.

DWIGHT THOMAS:

I know who you're speaking of.

SPEAKER:

Yeah.

DWIGHT THOMAS:

I know nothing about prison in Spain.

SPEAKER:

You don't know that he's alive and he's in prison?

DWIGHT THOMAS:

No.

WAYNE DOLCEFINO:

We found Thomas at his home in Inwood Forest, a home he shares with mayoral candidate Sylvester Turner.

It's the home Turner has been leasing inside the city limits since he announced plans to run for mayor.

The candidate claims the news about Foster was news to him, too.

SYLVESTER TURNER:

That guy died more than five or six years ago.

SPEAKER:

He's not dead.

SYLVESTER TURNER:

As far as we all know.

I mean, he went overboard.

SPEAKER:

He's in Spain.

SYLVESTER TURNER:

Not as far as I know.

WAYNE DOLCEFINO:

Both Dwight Thomas and Sylvester Turner were deeply involved in the Sylvester Foster case and the attempt to get life insurance companies to pay off 6.5 million dollars in the wake of the disappearance.

But did they know it was all a hoax, a scheme to swindle millions?

DWIGHT THOMAS:

No.

I wouldn't set myself up for something crazy like that.

SPEAKER:

And Sylvester Turner didn't know?

DWIGHT THOMAS:

No.

No.

We never would have—in fact, as a matter of fact, we wouldn't have dealt with him at all if we had known that he was doing something out of the ordinary beyond the premise of the law.

WAYNE DOLCEFINO:

But Thomas and Turner did deal with Sylvester Foster, even after learning he was the target of criminal investigations in early 1986, and they pursued the estate money even after significant evidence of a possible scam in Foster's death had already surfaced.

Dwight Thomas introduced Foster to his friend, attorney Sylvester Turner, in early 1986.

And in June of that year, Turner drew up a will for Foster; the timing interesting.

On June 13th, Sylvester Foster was indicted by a Houston federal grand jury for massive credit card fraud.

On June 19th, Foster rushed to sign the will in Turner's office, leaving the next day for a sail boat trip in the Gulf, despite what friends called his fear of the water.

June 22nd, nine days after the indictment, three days after drawing up the will, Foster supposedly falls off the boat in another boat's wake and drowns.

Curious?

Get this: In the weeks before the bizarre accident, Foster had applied for an emergency passport, bought several luxury cars with life insurance policies attached, and amassed millions in life insurance coverage.

Despite the signs of something fishy, Sylvester Turner began the legal effort to get the millions in insurance money released and get mutual friend, Dwight Thomas, appointed as administrator over the estate.

Thomas at first denied he sought control of Foster's estate until we told him about court documents we had viewed.

DWIGHT THOMAS:

The deal of it was, after he passed away, I found out that I was administrator of the estate.

So—

WAYNE DOLCEFINO:

In fact, Thomas petitioned the court to become administrator.

We then asked him why the evidence didn't make him suspicious.

DWIGHT THOMAS:

We looked into that.

I didn't really know—actually, I really didn't want to get too deeply involved in it because I didn't know what was going on.

SYLVESTER TURNER:

There have been times we made out a will for individuals and they die for various reasons shortly thereafter.

And you look at it and you say, well—you know, try and put together the circumstances by which it come about.

I mean, it does happen.

WAYNE DOLCEFINO:

Turner also tried to block questioning of a female friend of Foster's in this case, Christina Batura, a woman promised a share of the money in the will.

Batura died two years ago in an Hawaiian commuter plane crash, and Secret Service investigators now confirm they found letters and pictures that proved Batura knew Foster was alive, as she tried to collect on his death, and Turner helped her.

And investigators say they have statements that Turner's close friend, Dwight Thomas, threatened at least one witness who had told authorities Foster was alive.

Thomas denies he was part of any scam.

DWIGHT THOMAS:

No.

No.

No.

No.

No.

Undoubtedly no.

WAYNE DOLCEFINO:

Sylvester Turner pursued the estate case for a year, until a judge removed him from the case over Turner's protest, citing conflicts of interest.

In November of 1987, Turner tried to collect more than $28,000 in legal fees from the still unsettled estate for his work.

The bill was rejected.

Thomas never gained control of the estate.

And only one of nine insurance companies ever paid off any money in Foster's death.

And that money went to his father.

The mayoral candidate questions the timing of the revelations and claims he, too, was a victim, not part of any conspiracy to conceal Foster's European get-away.

SYLVESTER TURNER:

Sylvester Turner is the one that's been left with the bill.

WAYNE DOLCEFINO:

But if that's true, then Sylvester Turner was duped by overwhelming evidence and at least two legal clients with close ties to one of his closest friends.

SYLVESTER TURNER:

You told me the man is a liar.

The man ought to come back here and be dealt with, if that's the case.

If, in fact, he is, then he ought to be dealt with in the severest of terms.

WAYNE DOLCEFINO:

Do you feel used by him?

SYLVESTER TURNER:

Yeah.

WAYNE DOLCEFINO:

Sylvester Turner claims he fully cooperated with all of the investigations into Foster's disappearance, but at least three investigators very close to this case tell us that's simply not true.

And Bob, we'll continue to pursue the full story both here at home and in Spain.

BOB BOUDREAUX:

Is Foster coming back?

WAYNE DOLCEFINO:

The United States government is trying to extradite him back to Spain, and we have been trying through the U.S. embassy in Madrid to get contact with him.

BOB BOUDREAUX:

Thank you very much, Wayne. Keep following that one.

CHANNEL 13—December 1, 1991

10:00 p.m.

BOB BOUDREAUX:

Good evening, everyone, and thank you for joining us. It may very well be one of the biggest attempted insurance swindles in recent Houston history, the apparent conspiracy to fake the death of a Houston man with criminal troubles and millions of dollars in life insurance.

The question raised tonight is what role did mayoral candidate Sylvester Turner play in this insurance fraud? Tonight our Wayne Dolcefino has this exclusive 13 undercover investigation.

WAYNE DOLCEFINO:

In loving memory, the obituary read. It was June of 1986, and 30–year old Sylvester Clyde Foster, a male model and beauty salon owner, had died in a freak accident. Two companions claimed Foster had fallen off a sail boat and into the waters of the Gulf of Mexico six miles south of Galveston. The Coast Guard searched but the body was never found.

This week, 13 Undercover learned Sylvester Foster was very much alive and in prison in Salamanca, Spain, under an alias,

Christopher Lauren Fostier. Fostier had been arrested after allegedly delivering two kilos of cocaine to a Spanish undercover agent.

Dwight Thomas was said to be Foster's closest friend here in Houston. We asked him on Thanksgiving morning about Foster's miraculous return from the grave.

DWIGHT THOMAS:

Prison, Spain?

SPEAKER:

Uh-huh.

DWIGHT THOMAS:

Prison, Spain? Prison, Spain?

SPEAKER:

Sylvester Clyde Foster.

DWIGHT THOMAS:

I know who you're speaking of. I know nothing about prison and Spain.

SPEAKER:

You don't know that he's alive and he's in prison?

DWIGHT THOMAS:

No.

WAYNE DOLCEFINO:

We found Thomas at his home in Inwood Forest, a home he shares with mayoral candidate Sylvester Turner. It's the home Turner has been leasing inside the city limits since he announced plans to run for mayor. The candidate claims the news about Foster was news to him, too.

SYLVESTER TURNER:

That guy died more than five or six years ago.

SPEAKER:

He's not dead.

SYLVESTER TURNER:

As far as we all know. I mean, that's—he went overboard.

SPEAKER:

He's in Spain.

SYLVESTER TURNER:

Not as far as I know.

WAYNE DOLCEFINO:

Both Dwight Thomas and Sylvester Turner were deeply involved in the Sylvester Foster case and the attempt to get life insurance companies to pay off 6.5 million dollars in the wake of the disappearance. But did they know it was all a hoax, a scheme to swindle millions?

DWIGHT THOMAS:

No. I wouldn't set myself up for something crazy like that.

SPEAKER:

And Sylvester Turner didn't know?

DWIGHT THOMAS:

No. No. We never would have—in fact, as a matter of fact, we wouldn't have dealt with him at all if we had known that he was doing something out of the ordinary, beyond the premise of the law.

WAYNE DOLCEFINO:

But Thomas and Turner did deal with Sylvester Foster, even after learning he was the target of criminal investigations in early 1986, and they pursued the estate money even after significant evidence of a possible scam in Foster's death had already surfaced.

Dwight Thomas introduced Foster to his friend, attorney Sylvester Turner, in early 1986. And in June of that year, Turner drew up a will for Foster; the timing interesting.

On June 13th, Sylvester Foster was indicted by a Houston federal grand jury for massive credit card fraud. On June 19th, Foster rushed to sign the will in Turner's office, leaving the next day for a sail boat trip in the Gulf, despite what friends called his fear of the water.

June 22nd, nine days after the indictment, three days after drawing up the will, Foster supposedly falls off the boat in another boat's wake and drowns. Curious? Get this: In the weeks before the bizarre accident, Foster had applied for an emergency passport, bought several luxury cars with

life insurance policies attached, and amassed millions in life insurance coverage.

Despite the signs of something fishy, Sylvester Turner began the legal effort to get the millions in insurance money released and get mutual friend, Dwight Thomas, appointed as administrator over the estate. Thomas at first denied he sought control of Foster's estate until we told him about court documents we had viewed.

DWIGHT THOMAS:

The deal of it was, after he passed away, I found out that I was administrator of the estate.

WAYNE DOLCEFINO:

In fact, Thomas petitioned the court to become administrator. We then asked him why the evidence didn't make him suspicious.

DWIGHT THOMAS:

We looked into that. I didn't really know-actually, I really didn't want to get too deeply involved in it because I didn't know what was going on.

SYLVESTER TURNER:

There have been times we made out a will for individuals and they die for various reasons shortly thereafter. And you look at it and you say, well-you know, try and put together the circumstances by which it come about. I mean, it does happen.

WAYNE DOLCEFINO:

Turner also tried to block questioning of a female friend of Foster's in this case, Christina Batura, a woman promised a share of the money in the will. Batura died two years ago in an Hawaiian commuter plane crash, and Secret Service investigators now confirm they found letters and pictures that proved Batura knew Foster was alive, as she tried to collect on his death, and Turner helped her.

And investigators say they have statements that Turner's close friend, Dwight Thomas, threatened at least one witness who had told authorities Foster was alive. Thomas denies he was part of any scam.

DWIGHT THOMAS:

No. No. No. No. No. Undoubtedly no.

WAYNE DOLCEFINO:

Sylvester Turner pursued the estate case for a year, until a judge removed him from the case over Turner's protest, citing conflicts of interest. In November of 1987, Turner tried to collect more than $28,000 in legal fees from the still unsettled estate for his work. The bill was rejected.

Thomas never gained control of the estate. And only one of nine insurance companies ever paid off any money in Foster's death. And that money went to his father. The mayoral candidate questions the timing of the revelations and claims he, too, was a victim, not part of any conspiracy to conceal Foster's European get-away.

SYLVESTER TURNER:

Sylvester Turner is the one that's been left with the bill.

WAYNE DOLCEFINO:

But if that's true, then Sylvester Turner was duped by overwhelming evidence and at least two legal clients with close ties to one of his closest friends.

SYLVESTER TURNER:

You told me the man is a liar. The man ought to come back here and be dealt with, if that's the case. If, in fact, he is, then he ought to be dealt with in the severest of terms.

SPEAKER:

Do you feel used by him?

SYLVESTER TURNER:

Yeah.

WAYNE DOLCEFINO:

Sylvester Turner claims he fully cooperated with all of the investigations into Foster's disappearance, but at least three investigators very close to this case tell us that's simply not true. Wayne Dolcefino, 13 Eyewitness News.

BOB BOUDREAUX:

Now, tonight, Sylvester Turner called a news conference to attack that story as factually false, untrue, and misleading.

SYLVESTER TURNER:

When I have looked at the facts of this case and when you look at them, I think you will conclude that this is an all-time low in Houston politics. And I resent the fact that five days before the campaign, that these type of assertions are being made by anyone with reference to my character and my integrity.

BOB BOUDREAUX:

Turner claims the Foster story was hand-delivered to Channel 13 by opponent Bob Lanier's campaign, and within the last hour, the Lanier campaign reacted.

CRAIG VAROGA:

I think it's ridiculous that every time there's a story in the newspaper or on TV that raises serious questions about Sylvester Turner's public record, that he blames the Bob Lanier campaign.

BOB BOUDREAUX:

Reporter Wayne Dolcefino and Channel 13 stand by the story.

Justice HECHT, concurring in part and dissenting in part, and concurring in the judgment.

The Court holds in Part II of its opinion that a jury may find that a television news report critical of a public figure was false because it omitted facts that could have led a reasonable viewer to form a less adverse impression of the public figure. Such a lenient standard for measuring evidence of falsity—whether a reasonable person *could* have thought a news report any less damaging to a public figure if other facts had been included—is inconsistent with the rule that a statement is not defamatory if it is *substantially* true, and significantly threatens open and vigorous discourse

about matters of public interest. As the Court's analysis in this case demonstrates, almost any fact favorable to the subject of a news report, but omitted from its broadcast, *could* cause a reasonable person to think differently, and perhaps better, about the subject; thus, any such omission, under the Court's standard, would support a finding that the broadcast was false. In my view, an omission or juxtaposition of facts from a broadcast about a public figure cannot support a finding that the broadcast was false absent clear and convincing evidence [1] that but for the omission or juxtaposition a reasonable person *would* have had a better opinion of the public figure.

I do not disagree with the Court that a report may be false in import even if every statement made is itself true, and that such a report should be actionable. Omissions, half-truths, distortions, and innuendo can make a report as false as outright lies. True statements may be made in a context that does not create a truthful impression. For example, if KTRK had reported that Judge Hutchison was involved in a possible insurance scam without adding that his only involvement was in presiding over a case in which there was evidence of an insurance scam, the report, while true, would create the completely false impression that the judge's involvement was improper. An ordinary listener cannot be expected to parse "involved" finely enough to conclude that the judge was merely doing his job. The media can well appreciate how words can be woven to mislead and injure without making any false statement, and the prospect of liability for such conduct poses no threat to legitimate discourse.

Here, the broadcast reported that Turner was "deeply involved in the Sylvester Foster case and the attempt to get life insurance companies to pay off 6.5 million

---

1. *See Harte–Hanks Communications v. Connaughton*, 491 U.S. 657, 661 n. 2, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (noting, but expressing no opinion, on the debate as to whether falsity mut be shown by clear and convincing evidence), and the cases cited therein.

dollars in the wake of the disappearance." But the report did not stop there; its other details explained exactly how Turner was "involved"—that Turner was acting as a lawyer in drafting the will for Foster and in representing Thomas in the probate proceeding. The description of Turner's activities is substantially true; any errors in describing the precise time period involved in preparing the will, the amount of the insurance coverage, and the capacity in which Turner's client appeared in the probate proceeding, are immaterial. Mere speculation about what Turner knew, and when he knew it, is not actionable, and neither is any implied criticism about Turner's choice of clients.

Legitimate discourse is significantly impaired if the test for determining whether a report has created a false impression by the omission or juxtaposition of facts is merely that a reasonable person *could* have formed a less negative impression of a public figure had the report been different. The omission of almost any fact favorable to the public figure passes this test, as the Court's analysis proves. Twice the Court says that an accurate broadcast by KTRK and Dolcefino would have raised "serious", "troubling" questions about Turner's association with Foster and Thomas and would not have been actionable.[2] But the Court concludes that the broadcast falsely suggested that Turner not only had questionable associations but that he was personally involved in a scam.

According to the Court, "the broadcast's most misleading omission concerned Turner's actions as lawyer for Foster's estate."[3] The following four omissions, the Court says, could have caused a reasonable viewer to think that Turner was more personally involved:

- by stating that Turner had moved to have Thomas appointed administrator of Foster's estate, without explaining that Thomas had been named independent executor in Foster's will and Turner's actions were no different than any attorney hired to probate a will;

- by failing to state that Foster's father was the primary beneficiary under Foster's will, leaving the impression that Turner or Thomas might have benefitted personally from the probate of the will;

- by stating that Turner was removed as the attorney for the estate for a conflict of interest without explaining that the conflict was not unethical conduct but was simply that Turner would be a fact witness in the case and could not therefore serve as legal counsel also; and

- by stating that Turner's application to be paid his legal fees was rejected without explaining why, even though the record itself contains no clear explanation.

Somewhat inconsistently, the Court concludes in Part III of its opinion that Dolcefino cannot be faulted for omitting these facts because as a non-lawyer, he may not have understood their significance in the probate proceeding. If Dolcefino, a veteran reporter who investigated the proceeding before broadcasting his report, did not understand the significance of the facts the Court now thinks should have been included, it is not immediately clear why an ordinary viewer would have had any better understanding. But inconsistency aside, the analysis shows how relaxed the Court's standard for falsity is when facts are omitted from a report. *Could* a reasonable viewer have been less inclined to think that Turner stood to gain personally from his actions if the omitted facts had been included in Dolcefino's report? Sure. *Would* a reasonable person have been less inclined to think Turner would benefit personally? Maybe, but the Court does not even ask this question. The determinative question should be: if a reasonable viewer was misled by the omission of information into thinking that Turner was trying to benefit personally from an insurance scam, is it clear that this reasonable viewer

2. *Ante* at 117, 118.

3. *Ante* at 118.

would think better of Turner if the additional information persuaded him that Turner was only unknowingly helping a friend perpetrate a scam? In the Court's view, for the jury to have found that the report was false, all that is necessary is that it was *possible* for a reasonable person to have thought less of Turner than he might have if he had known the omitted facts.

The only other omission the Court finds misleading is not really an omission but rather the confusion in the report about whether Turner drew up Foster's will three days or three to four weeks before Foster died. The fact that Turner worked on Foster's will for weeks instead of days was enough, the Court says, for a reasonable viewer to have thought better of him. Somewhat inconsistently, the Court concludes that an average viewer would not have cared whether the scam involved $6.5 million or only $875,000. Misstating the amount involved by a factor of seven could not have been misleading; misstating the time period Turner worked on the will by the same factor was misleading. My point is simply that if the standard for determining falsity is nothing more than what a reasonable viewer *could* have thought, almost any omission can pass.

A statement need not be absolutely true to avoid liability for defamation; substantial truth is enough.[4] Under Texas law, "[t]he test used in deciding whether [a statement] is substantially true involves consideration of whether the alleged defamatory statement *was* more damaging to [the plaintiff's] reputation, in the mind of the average listener, than a truthful statement *would* have been."[5] The Court lowers the bar for determining whether the omission or juxtaposition of facts makes a report less than substantially true (what the Court calls "substantially false"). The relevant inquiry, according to the Court, is not whether the report *was* more damaging than a more complete statement *would* have been, but whether any omitted fact

*could* have influenced the viewer's thinking. Under this rule, a report that contains nothing but true facts but omits some facts is much less likely to be substantially true than a single incorrect statement. Since virtually any news report on a complex subject involves some editorial determination of what to include and what to exclude, the threat that the report may be found to have been false is increased by the test the Court uses in this case.

The Court's test for falsity, combined with the high test for actual malice, makes its conclusions strikingly incongruous. According to the Court, Turner acted as legal counsel for a long-time friend, Thomas, and for Thomas's friend, inadvertently furthering an insurance scam that Turner himself knew nothing about. By omitting facts about technical aspects of the probate proceeding from their report, KTRK and Dolcefino made it possible for a reasonable viewer to think that Turner knew of the scam and stood to benefit himself. But, the Court concludes, this veteran reporter was not a lawyer and did not appreciate the significance of what he was doing; he simply bungled the story by leaving out key facts. And had those facts been part of the report, it is possible that an average viewer—also a non-lawyer with no appreciation of the significance of the added information—might not have been as critical of Turner's conduct. This is a crooked furrow to plough.

Public figures criticized in the public press frequently complain that the media has not told the whole story and that had it done so, they would have appeared in a more favorable light. In the Court's view, free discourse is adequately protected from such complaints as long as the media can plausibly claim negligence and thereby defeat proof of actual malice. This is a tortuous approach to guarantying a fundamental freedom. I would simply require that a claim that a report is false because

---

4. *McIlvain v. Jacobs*, 794 S.W.2d 14, 15–16 (Tex.1990).

5. *Id.* at 16 (emphasis added).

of the omission or juxtaposition of facts be proved by clear and convincing evidence.

I would hold that the proof of falsity in this case, as well as the proof of actual malice, is insufficient. Accordingly, I concur only in Parts I and III of the Court's opinion and in the judgment.

Justice BAKER, joined by Justice ENOCH and Justice HANKINSON, concurring in part and dissenting in part.

I concur with parts I and II of the Court's opinion. However, after independently examining the record, I believe Turner provided clear and convincing evidence that Dolcefino published the story knowing it would present the false impression that Turner participated in a conspiracy to commit insurance fraud. Accordingly, I dissent to part III of the Court's opinion.

## I. APPLICABLE LAW

### A. STANDARD OF REVIEW

In cases implicating the First Amendment, federal constitutional law requires appellate courts to independently examine the whole record to insure that the judgment does not improperly intrude upon free expression. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510–11, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *New York Times Co. v. Sullivan*, 376 U.S. 254, 284, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Doubleday & Co., Inc. v. Rogers*, 674 S.W.2d 751, 755 (Tex.1984). Under this standard, a court "must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Bose*, 466 U.S. at 510, 104 S.Ct. 1949. Nevertheless, when applying this constitutional standard of review, a court must be faithful to the fact-finder's role in the process.

Under established Texas jurisprudence, a reviewing court must defer to the fact-finder's credibility determinations because the jury is the exclusive judge of the facts,

the witnesses' credibility, and the weight given to their testimony. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 796 (Tex.1951). The court may not substitute its findings and conclusions for that of the jury. *Benoit*, 239 S.W.2d at 796. Once it resolves credibility questions in favor of the jury's verdict, it must independently evaluate the statements and circumstances to see whether the First Amendment protects them. *See Harte–Hanks Communications v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

### B. ACTUAL MALICE

As a public figure, Turner must provide clear and convincing evidence of actual malice. *New York Times*, 376 U.S. at 279–80, 285–86, 84 S.Ct. 710; *Doubleday*, 674 S.W.2d at 755. Actual malice is a term of art, focusing on the defamation defendant's attitude toward the truth of what it reported. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 573 (Tex.1998). To establish actual malice, a public figure must prove that the defendant made the statement with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710; *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 420 (Tex.2000). Reckless disregard is also a term of art. To establish reckless disregard, the public official or public figure must prove that the publisher entertained serious doubts about the publication's truth. *See St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Huckabee*, 19 S.W.3d at 420. This standard protects innocent but erroneous speech on public issues yet still deters "calculated falsehoods." *Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

While the First Amendment protects the exercise of editorial discretion, it does not protect the publisher who abuses that discretion knowingly to create a false impression of events. *See Huckabee*, 19 S.W.3d at 426. Although actual malice focuses on

the defendant's state of mind, a plaintiff can prove it through objective evidence about the publication's circumstances. *Herbert v. Lando,* 441 U.S. 153, 160, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *Bose Corp. v. Consumers Union,* 692 F.2d 189, 196 (1st Cir.1982), *aff'd,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Frank B. Hall & Co. v. Buck,* 678 S.W.2d 612, 621 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

When a defendant knowingly omits critical facts and thereby distorts the entire character of a story, such actions raise an inference that the defendant acted with actual malice. *See Huckabee,* 19 S.W.3d at 426; *see also Eastwood v. National Enquirer, Inc.,* 123 F.3d 1249, 1256 (9th Cir.1997)(concluding that actual malice requires that defendants know that language choice was misleading); *Newton v. National Broad. Co.,* 930 F.2d 662, 680 (9th Cir.1990)(concluding that defendant must know that the broadcast's arrangement of material created a false impression); *Dixon v. Ogden Newspapers, Inc.,* 187 W.Va. 120, 416 S.E.2d 237, 244 (1992)(concluding that evidence of a defendant's intentional omission misleading readers supports an actual malice finding). One may infer that the defendant knew the story would convey a false impression of events, or, at a minimum, that the defendant entertained serious doubts about the story's overall truthful impression. *See St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323; *Huckabee,* 19 S.W.3d at 426; *see also Schiavone Constr. Co. v. Time, Inc.,* 847 F.2d 1069, 1092 (3d Cir.1987). But merely presenting an unbalanced story or failing to include details favorable to the plaintiff does not raise such an inference. *See Huckabee,* 19 S.W.3d at 426.

## II. ANALYSIS

After reviewing the entire record and applying the proper standard of review, I conclude that there is clear and convincing evidence of actual malice. Here, Turner's evidence clearly and convincingly shows that Dolcefino manipulated the facts to exaggerate Turner's role in the Foster matter and that the defendants knew the communication as a whole could present a false and defamatory impression of events. *See Huckabee,* 19 S.W.3d at 426; *see also Perez v. Scripps–Howard Broadcasting Co.,* 35 Ohio St.3d 215, 520 N.E.2d 198, 204 (1988)("Where sensationalism is sought at the expense of truth, actual malice may be inferred.").

At trial, Dolcefino repeatedly admitted that he had no proof that Turner participated in a criminal insurance conspiracy. The record of Dolcefino's investigation confirms this. Although Elliott, Colwell, and Fry told Dolcefino their suspicions about Turner, all admitted that there was no evidence to support the suspicions. Johannsen also told Dolcefino that he knew of no evidence in the public record linking Turner to an insurance conspiracy. Dolcefino also knew before the 10 p.m. broadcast that both Hutchison and McConn had stated that, to their knowledge, Turner was innocent of any wrongdoing.

This record raises a strong inference that Dolcefino, through omission and juxtaposition, manipulated the facts to increase suspicion about Turner. This manipulation is clear and convincing evidence of actual malice. *See Huckabee,* 19 S.W.3d at 426; *Schiavone,* 847 F.2d at 1092.[1]

I recognize that merely presenting an unbalanced story and failing to include details favorable to the plaintiff does not raise an inference that the defendant

---

1. Many cases on which I rely in reaching this conclusion, including *Huckabee* and *Schiavone,* are summary judgment cases using lower standards of review. However, despite their differing procedural postures, each case espouses a valid rule of law: actual malice may be inferred through intentional omissions that so distort a viewer's perception that the viewer receives a substantially false impression of events. *See, e.g., Eastwood,* 123 F.3d at 1256; *Newton,* 930 F.2d at 680; *see also Dixon,* 416 S.E.2d at 244; *Perez,* 520 N.E.2d at 204.

knew, or recklessly disregarded, that the story would convey a false impression of events. Thus, in *Huckabee*, we held that the defendant's failure to list all evidence supporting a judge's decision was not evidence of actual malice, especially when the broadcast aired a part of the judge's explanation for his ruling. *See Huckabee*, 19 S.W.3d at 426. However, Dolcefino did more than merely present an unbalanced story. He omitted key facts, particularly in regard to Turner's representation of the estate, and these omissions significantly changed the story's character. An accurate report would have portrayed Turner as a lawyer drafting a will and probating an estate, albeit for a suspicious client under suspicious circumstances. But, here, the broadcast's omission of crucial facts suggests that Turner acted unethically or even criminally. This distortion is part of the evidence that raises the inference that Dolcefino acted with actual malice.

Other critical evidence supporting an inference of actual malice includes Dolcefino's not reporting that he knew Foster's will named Thomas as executor. A reasonable viewer could be left with the false impression that it was Turner's idea to place Thomas in control of the estate. Similarly, after reading the probate records, Dolcefino should have known that Turner worked on the will for over a month and was not in his office when Foster signed it. Dolcefino never mentioned these facts. Instead, Dolcefino's broadcast gave the impression that Turner hurriedly drafted the will three days before Foster disappeared. Nor did the broadcast mention that the testamentary trust and most of the other life insurance policies primarily benefitted Foster's father, not Thomas or Turner. Furthermore, Dolcefino did not report that Turner did not probate the will until the Coast Guard issued a formal report stating that Foster was presumed "drowned." The probate records included the Coast Guard report and the deposition of an officer who investigated the incident.

The discussion of Turner's disqualification and fee rejection provides additional evidence that Dolcefino knowingly manipulated the facts to present the false impression that Turner was involved in criminal conduct. The probate records make clear that the only conflict Turner faced was between his roles as the estate's attorney and as a potential fact witness. Dolcefino did not mention this in the broadcast, though he admitted at trial that he knew accusing a public official of conflicts of interest had serious implications. Dolcefino's decision to juxtapose the "conflict of interest" statement with the discussion of Turner's fee rejection also indicates actual malice. *See Crane v. The Arizona Republic*, 972 F.2d 1511, 1524 (9th Cir.1992); see also *Eastwood*, 123 F.3d at 1256. Placing these two items together suggests the temporary administrator rejected Turner's fee *because of* conflicts of interest, when nothing in the probate records linked the two events. In fact, Johanssen had earlier told Dolcefino that Turner's fee request had been rejected because it was not timely filed.

Because of its half-truths and misleading juxtapositions, the broadcast's version of Turner's representation of the estate differed significantly from the account revealed in the probate records. The disparity between these two accounts raises an inference that Dolcefino, who had read the probate records, was aware that the broadcast created a false impression. While the jury could have believed Dolcefino's assertion that he did not know that the broadcast was false, they clearly rejected his testimony as not credible. We must defer to the jury's judgment. *See Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678; *Benoit*, 239 S.W.2d at 796.

The addendum that Dolcefino prepared for the 10 p.m. broadcast also demonstrates actual malice. First, Dolcefino broadcast the Lanier campaign's denial that the story was connected to their campaign, despite the fact that he knew that

his primary source, Peary Perry, was "on the Lanier side of the equation." Perry was in fact a member of the Lanier campaign-finance committee. He gave Dolcefino a one-page memo about the Foster Turner situation, and was responsible for Dolcefino's receiving a copy of the probate record. Then KTRK's anchor, reading from a script Dolcefino prepared, appeared to endorse the Lanier campaign's position by stating that "KTRK and Wayne Dolcefino stand by the story." By broadcasting the Lanier campaign's denial and then appearing to endorse it, Dolcefino made it appear that Turner lied about the story's source, when he knew Turner's claim about the story's source was true. Further, suggesting the story was not politically motivated falsely made the story more credible than if Dolcefino had disclosed Perry's connection with the Lanier campaign.

Moreover, in the days following the story, Dolcefino continued to hide the true facts of the political connection, even when KTRK produced a non-political source, Clyde Wilson, as the story's "real source" and castigated Turner for not apologizing to the Lanier campaign. Although this conduct does not directly bear on the broadcasts at issue, it is additional evidence of a deceptive pattern on Dolcefino's part that supports the jury's finding. *See Herron v. KING Broad. Co.*, 109 Wash.2d 514, 746 P.2d 295, 303 (1987), *clarified on rehearing*, 112 Wash.2d 762, 776 P.2d 98 (1989).

### III. CONCLUSION

I recognize that "vigorous reportage of political campaigns is necessary for the optimal functioning of our democratic institutions and central to our history of individual liberty." *Harte–Hanks*, 491 U.S. at 687, 109 S.Ct. 2678. But a calculated falsehood, inserted into the midst of a heated political campaign, can unalterably distort the process of self-determination. "For the use of a known lie ... is at once at odds with the premises of democratic gov-

ernment and the orderly manner in which economic, social, and political change is to be effected." *Garrison*, 379 U.S. at 75, 85 S.Ct. 209. Half-truths strung misleadingly together are no less destructive of democracy than an outright lie.

The record as a whole convinces me that Turner provided clear and convincing evidence that Dolcefino published the story knowing that it would present the false impression that Turner participated in a conspiracy to commit insurance fraud. Because the Court's opinion concludes otherwise, I respectfully dissent to section III.