# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00113-CV

**L. Z., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 395TH JUDICIAL DISTRICT
NO. 10-2616-F395, HONORABLE MICHAEL JERGINS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

L.Z. appeals the trial court's order terminating his parental rights to his child, J.Z., following a bench trial.[1]  L.Z. challenges the legal sufficiency of the evidence to support the order of termination for failure to complete the family service plan, *see* Tex. Fam. Code Ann. § 161.001(1)(O) (West Supp. 2011), and the factual sufficiency of the evidence to support the trial court's conclusion that termination was in the best interest of J.Z., *see id.* § 161.001(2) (West 2008). Because we conclude that the evidence was legally and factually sufficient, we affirm the trial court's order.[2]

---

[1] We use initials to refer to appellant and his child.  *See* Tex. R. App. P. 9.8.

[2] J.Z.'s mother voluntarily relinquished her parental rights and is not a party to this appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

The appellate record shows that L.Z. has an extended history with child protective services in this state and two others. He and his former girlfriend were contacted by child protective services in Florida in response to four separate referrals in 2001 and 2003 regarding family violence and were investigated in Maryland in 2005 concerning neglectful supervision of one or more of their three children. L.Z. moved to Texas in 2007 or 2008 and has been actively under investigation or receiving services from the Department since 2008 as a result of issues with alcoholism, drug addiction, and anger management and domestic violence. The Department removed his three older children in July 2009. L.Z. completed an intensive outpatient drug and alcohol treatment program in December 2009, and three months later he was arrested for public intoxication.

During the summer of 2008, L.Z. had become romantically involved with J.Z.'s mother, S.W., whom he met in February 2008, and on March 10, 2010, while the case concerning L.Z.'s three older children was still pending, J.Z. was born. On July 4, 2010, L.Z. admittedly smoked marijuana. On August 11, 2010, two referrals were made to the Department regarding J.Z. The first alleged neglectful supervision by L.Z. and S.W. and included allegations of domestic violence. The second alleged physical abuse of J.Z. by L.Z., specifically that he had held J.Z. upside down by his ankles and dropped him onto a pillow on the floor. The Department investigated and found no external evidence of physical abuse against J.Z. Although both L.Z. and S.W. denied allegations of domestic violence, the Department later learned that there had been approximately eight other law enforcement calls to the home for verbal disturbance, physical disturbance, and welfare checks, including one on August 11, 2010, prior to the referrals. The Department also

2

learned of L.Z.'s prior arrest in Texas for public intoxication, which he had failed to disclose, and his extensive out-of-state criminal history.[3] Subsequent drug test reports for both L.Z. and S.W. were negative; however, both samples were "diluted."

On August 19, 2010, with the agreement of L.Z. and S.W., the Department placed J.Z. with his maternal grandparents. On August 20, 2010, L.Z.'s referral to Family Based Safety Services was rejected based on his prior completion of services with no signs of progression. On September 13, 2010, the grandparents informed the Department that they could no longer provide for J.Z., and that same day the Department took custody, filed an original petition for protection of a child, conservatorship, and termination, and was appointed temporary managing conservator of J.Z. The petition alleged several grounds for termination, including failure to comply with the provisions of the court's order that established the actions necessary to obtain the return of the child. *See id.* § 161.001(1)(O). On September 24, 2010, the Department filed its report to the court, which included the determinations regarding the allegations made in the referrals, proceeding under the neglectful supervision allegation. Physical abuse, the second allegation, was ruled out.

The Department placed J.Z. in foster care and prepared a family service plan for L.Z. The plan stated that the permanency goal was to reunite the family. The tasks assigned to L.Z. included various types of therapy, a psychological examination, and refraining from criminal activity. In November 2010, L.Z. was arrested for driving while intoxicated, and several days later he relinquished his parental rights to his three older children. In January 2011, the Department filed a

---

[3] The record reflects arrests for stalking (two), burglary, trespass, criminal mischief, battery (two), violation of a protective order (three), second degree assault, consuming alcohol on public property, and assault causing bodily injury.

permanency report stating family reunification as the goal. In September 2011, S.W. moved out of the home she shared with L.Z., and during the first week of December 2011, L.Z. was again arrested for driving while intoxicated. Ultimately, the Department determined that the goal of reunification was unattainable and filed its final permanency report on December 6, 2011, indicating a goal of placement with a relative.[4] The case proceeded to a bench trial in the following week.[5] The trial court heard testimony from L.Z., S.W., J.Z.'s foster father, the Department investigator and caseworker, L.Z.'s pastor, therapist, and outpatient counselor, the psychologist who evaluated L.Z., and L.Z.'s mother.

**L.Z.'s Testimony**

L.Z. testified that the Department initially became involved with him concerning his three older children because of his issues with alcoholism, drug addition, and anger management and that his drug of choice was marijuana. He stated that he voluntarily entered an inpatient recovery center in late 2008, where he spent four months learning faith-based skills for coping with his issues. He also stated that he had completed intensive outpatient treatment in connection with the prior Department case in December 2009 but subsequently relapsed in March, July, and November 2010, and more recently in May 2011, following his intensive outpatient treatment, and again in September 2011, after S.W. left him. He explained that in May 2011 he began drinking again and

---

[4] The report stated that a home study had been approved on J.Z.'s maternal grandmother, one would be ordered on his paternal grandmother, and the foster family wanted to be considered for long-term placement if the parents' rights were terminated.

[5] In exchange for L.Z.'s withdrawal of his jury demand, the Department proceeded to trial on only one ground for termination, that stated in section 161.001(1)(O). *See* Tex. Fam. Code Ann. § 161.001(1)(O) (West Supp. 2011).

using synthetic marijuana. He acknowledged withholding information from the Department and his therapist out of "fear of the department" and that he had repeatedly violated court orders.

Of the tasks required in his service plan, L.Z. testified that he had completed anger management classes, couples and individual therapy, and outpatient treatment; taken a psychological examination and submitted to random drug testing; and done his best to remain employed so as to provide financial resources for J.Z. He further testified that he had failed to complete aftercare following outpatient treatment, cognitive therapy, and a batterers' intervention program, refrain from criminal activity, or attend three Alcoholics Anonymous (AA) or Narcotics Anonymous (NA) meetings a week, stating that he completed four steps of the twelve-step program. Regarding the requirement to provide stable and suitable housing for J.Z., L.Z. testified that he has resided in two places during the pendency of the case, currently rented a room in a house, and couldn't attend his scheduled appointment with the caseworker, so that she has not seen his current residence. Concerning his cooperation with the Department in planning goals, L.Z. stated that he had not been present for all of the team meetings and had attended two of the court settings. As for visitation with J.Z., L.Z. testified that he had not been "to every single one of them, but [had] . . . gone to visits with him," had transportation issues, and had spent three hours with J.Z. in the last three months. L.Z. admitted to domestic violence in his prior and current relationships but denied ever being physically abusive with S.W. He also stated that the issues behind the removal of his three older children—his problems with alcohol abuse, drug addition, and domestic violence—were still issues for him. He

5

further testified that he was in relapse and was not currently a safe caregiver for J.Z. but his mother would be and he would like to retain his parental rights and take J.Z. to Florida to live with his mother.

**S.W.'s Testimony**

S.W. testified that around the time that J.Z. was born, L.Z. was using marijuana "pretty frequently" and drank two to three times a week on his days off. She further testified that he became violent or aggressive on multiple occasions, when he was drinking, and that she lied to investigators and her therapists when she denied domestic violence in their home, including denying that L.Z. held J.Z. by his ankles and dropped him onto a pillow. She also described two instances of L.Z.'s violence against her during the pendency of the Department case and stated that she sought a protective order in August 2010 but was told by the police that since she had not filed any previous reports, they could not help her. S.W. further testified that L.Z. continued to drink and use synthetic marijuana during his outpatient treatment, took someone else's urine to the drug tests—twice, she believed—and that the longest time she or L.Z. had been clean and sober was four to five months.

S.W. acknowledged that she withheld her criminal history from the Department and has assaulted L.Z. in the past. She stated that she intended to relinquish her parental rights because she feels it is in J.Z.'s best interest, that the foster family "love[s] him and . . . would take him as their own," and that it is obvious from seeing them together that J.Z. loves his foster parents more than her or L.Z. S.W. testified that she understood that termination of L.Z.'s rights would end all need for future contact between her and L.Z. and that she wanted a new start, but that she was testifying as she was because she believes J.Z. deserves to live in a home free of drugs, alcohol

6

abuse, and domestic violence and not because she hates L.Z. Regarding possible placement with her mother, Sh.W., S.W. testified that Sh.W. "tends to be quite dramatic" and "creates stress." S.W. acknowledged that she had previously testified that Sh.W. had abused her and had also requested that J.Z. be placed with Sh.W.

**Foster Father's Testimony**

J.Z.'s foster father testified that J.Z. had lived with him and his family since October 2010, was doing extremely well, and was "happy . . . thriving . . . [and] learning lots of things and learning new words." He stated that he and his wife love J.Z. and J.Z. considers them his parents. He further testified that his plans for J.Z. are to "continue watching him grow" and to facilitate his interest in music and drumming, including by continuing the family's participation in an orchestra project at the University of Texas. He stated that J.Z. had lived most of his life with him and he believes he could provide J.Z. stability.

**Paternal Grandmother's Testimony**

L.Z.'s mother testified, through an interpreter, that she was born in Nicaragua and lives in Miami, where she has lived for the past twenty-three years. She stated that L.Z. has been using marijuana and alcohol since he was sixteen years old, started therapy because of it, and lied to her about abstaining. She also stated that she had seen "a little" change in L.Z. in the past year but "behind a good man, there's a good woman, and that is something he has not had." L.Z.'s mother further testified that she divorced L.Z.'s father because of domestic violence. She stated that she is seeking custody of J.Z. on her own, has the financial resources to raise him, and if L.Z. were

7

to get J.Z. back, she believes L.Z. would "give him to [her] care." She testified that the foster family is "good," she will work with them if she gets custody of J.Z., and she would be able to withhold J.Z. from L.Z. and grant access to S.W. if S.W. were clean and sober and L.Z. were not.

**Caseworker's Testimony**

Kerrie Judice testified that she had been involved with L.Z. on behalf of the Department consistently since June 2009, her concerns in both cases were substance abuse and domestic violence, and L.Z. has not addressed those concerns. She stated that originally the permanency goal was reunification but the goal changed when the Department learned in October 2011 of "continuing concerns." Judice testified that during her discussions with L.Z., he had not been forthcoming about sobriety and relapse. She further testified that she would not have supported reunification in the initial permanency plan if she had known of some of the events she had heard about in testimony that day, including continued drug and alcohol use. Regarding L.Z.'s service plan, Judice testified that, in her opinion, he had not completed it and that although he had completed some of the tasks, her primary concern was his "actually using . . . the tools that he's learned in his services" and "actually[] making the changes." She acknowledged that relapse is a possibility in most cases and that the goal is to understand the triggers for relapse but stated that while L.Z. seems to understand his triggers, his actions do not indicate that "he can do anything about it." Judice further testified that she agreed that J.Z. would not be safe with L.Z. She confirmed that the Department had previously recommended placement with J.Z.'s maternal grandmother, Sh.W., but expressed concerns that Sh.W. exhibited "emotional behavior." She

8

acknowledged that S.W. had previously testified that Sh.W. had physically abused her and stated that for that reason the Department's recommendation had included that Sh.W. enter counseling.

**Investigator's Testimony**

Bernadette Yupit-Martinez testified that she was the primary investigator on the case and the investigation lasted approximately one and one-half months. She stated that her ruling on the allegation of neglectful supervision due to allegations of drinking and domestic violence was "reason to believe" and that her disposition of the allegation of physical abuse of J.Z. by L.Z. was "ruled out." She further testified that if she had subsequently learned that the allegation that J.Z. had been dangled by his ankles had been confirmed by one of the parents present, she would not have ruled out physical abuse.

**Therapist's Testimony**

Curtis Lawrence testified that he is a licensed clinical social worker, was L.Z.'s individual therapist, and conducted three couples sessions with L.Z. and S.W. and that L.Z. actively participated in therapy. Lawrence further testified that although he has seen some changes in L.Z.—showing more appropriate behaviors and an overall ability to manage his anger and take accountability for his actions—L.Z. has been in relapse since July 2011, is not using the tools he has learned to the extent Lawrence would like, is not a safe parent, and cannot provide the type of parenting J.Z. needs. He also stated that it concerns him that after being in treatment three times in the last three years, L.Z. is still abusing alcohol and marijuana and expressed concerned about L.Z.'s mental health because relapse can cause depression and lead to further problems.

9

**Psychologist's Testimony**

William Dubin testified concerning the results of the psychological exam he administered on L.Z. on September 25, 2010, which included an initial interview of thirty to forty-five minutes, followed by a series of tests. Dubin stated that L.Z. scored high in the vocabulary portion of the I.Q. test but much lower in "abstraction," making his "full scale" I.Q. fall into the "dull normal range," which, he noted, was significantly less than one would expect from L.Z.'s high vocabulary. Dubin further testified that L.Z.'s performance on the Wechsler Adult Intelligence Scale ranged from poor to low average and that he interpreted the results to indicate that L.Z.'s ability to parent a small child is less that is apparent from a casual meeting with L.Z. and that his overall intellect is inadequate for successful parenting.

Dubin also testified that L.Z. suffers from impulsivity and that "this irresponsibility component" was the "primary finding of [his] report." He explained that there are different kinds of irresponsibility, L.Z.'s irresponsibility is "predatory, which is very serious," and people with a "predatory or psychopathic sort of dangerousness . . . simply disregard the rights of others . . . and they'll use others like objects." He further stated that L.Z.'s exhibiting predatory characteristics caused him to have concerns regarding L.Z.'s ability to parent successfully. Additionally, Dubin testified that L.Z. has narcissistic personality disorder with obsessive compulsive and anti-social personality traits, explaining that "psychopathy is considered to be . . . the combination of narcissism and anti-social characteristics." He stated that "one of the major characteristics of psychopaths is glibness and superficial charm, the ability to convince people like [him] or a therapist or the Court that he's, in fact a good person when, in fact, that's not the case" and that "psychopaths are

10

extraordinarily competent in passing courses and convincing people that they are good at what they're trying to convince people they're good at." He also related his opinion that L.Z. is more interested in winning the case than actually having custody of J.Z.

Dubin disagreed that L.Z.'s therapist would be in a better position to comment on L.Z.'s ability to parent because the therapist's loyalty is to L.Z. while his loyalty is to the truth and his concern is not for L.Z. but for J.Z. Additionally, he testified that psychopaths "are very charming, very good at conning and manipulative" and "if a psychopath wanted to bond with a therapist, they'd be extraordinarily good at it." Dubin stated that if admitting to wrongdoings would help L.Z.'s position, he would not be surprised to learn that L.Z. had made such admissions and that it would be consistent with his diagnosis if L.Z. had begun to admit to wrongdoings after things started to go poorly for him. Finally, Dubin testified that psychopaths are resistant to therapy and tend not to make much change, this is the case with L.Z., and he would not feel comfortable recommending that L.Z. be given custody of J.Z.

**The Trial Court's Ruling**

After the close of evidence, the trial court determined that L.Z.'s parental rights should be terminated, finding by clear and convincing evidence that L.Z. had failed to comply with the family service plan and that termination was in the best interest of J.Z. The trial court appointed the Department permanent managing conservator of the children. In response to a request by L.Z., the trial court made findings of fact and conclusions of law. The trial court's findings of fact included:

2.    The Court finds that the Child the subject of this suit has been in the Department's conservatorship since the 13th day of September, 2010. The Court finds that the child was removed from [L.Z.] due to concerns of neglectful supervision and risk of physical abuse.

3.    The Court finds that [L.Z.] has failed to demonstrate the ability to alleviate the concerns of abuse and/or neglect. The Court finds that [L.Z.] is not capable of providing the child with a safe environment.

4.    The Court finds that [L.Z.] did not complete the court-ordered services and other provisions that specifically established the actions necessary for him to obtain the return of the children. [L.Z.] failed to attend cognitive education classes, failed to maintain stable and suitable housing, did not consistently attend AA/NA, was unable to refrain from criminal activity, did not consistently visit with his child, demonstrated an inability or unwillingness to refrain from drug use, and failed to follow through with the aftercare recommendations from his substance abuse treatment program.

5.    The Court finds that [L.Z.] has significant and extensive history of involvement with the Department and of engaging in criminal activity.

6.    The Court finds that [L.Z.] admitted to a long history of substance abuse and has yet to establish a pattern of sobriety.

7.    The Court finds that, under the totality of the circumstances, termination of the parent child relationship between [L.Z.] and the child was in the best interest of the child.

## ANALYSIS

To terminate a parent's rights to a child under section 161.001 of the family code, the Department must establish that (1) the parent has committed conduct prohibited by section 161.001(1), and (2) termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Because "'termination is a drastic remedy and is of [great] weight and gravity,'" *see In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980)), grounds for termination must be supported by clear

and convincing evidence, Tex. Fam. Code Ann. §§ 161.001, .206(a) (West 2008); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (due process requires clear and convincing standard of proof in parental termination cases). The clear and convincing standard is "'that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re C.H.*, 89 S.W.3d at 23 (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see also* Tex. Fam. Code Ann. § 101.007 (West 2008) (defining clear and convincing evidence).

L.Z. raises legal and factual sufficiency challenges to the evidence. When reviewing the legal sufficiency of the evidence to support a termination, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the factfinder's conclusions and the role of a reviewing court, we must "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* In conducting a factual sufficiency review of the evidence to support a termination finding, we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* (citing *In re C.H.*, 89 S.W.3d at 25); *see also In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (describing factual sufficiency standard of review in appeals from termination orders). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

**Compliance with Family Service Plan**

In his first issue, L.Z. contends that the evidence is legally insufficient to support termination of his parental rights under section 161.001(1)(O), which provides:

> The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
>
> (1)    that the parent
>
> . . .
>
> (O)    failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

Tex. Fam. Code Ann. § 161.001(1)(O). L.Z. advances three arguments in support of his position that the evidence is legally insufficient. We address each argument in turn.

### *Removal for abuse or neglect*

We turn first to L.Z.'s argument that termination under this section was improper because J.Z. was not removed for "abuse or neglect" but was instead removed based only on "concerns" of abuse or neglect. The supreme court has not expressly addressed whether removal as a result of "abuse or neglect" is a required element of proof for termination under section 161.001(1)(O). *See In re A.A.A.*, 265 S.W.3d 507, 514 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (discussing *In re J.F.C.*, 96 S.W.3d at 278–79, in which supreme court found conduct described in 161.001(1)(O) established as matter of law without addressing issue of removal for

14

abuse or neglect). However, a number of our sister courts have held that it is. *See, e.g.*, *id.* at 515; *In re S.A.P.*, 169 S.W.3d 685, 705 (Tex. App.—Waco 2005, no pet.); *In re H.S.V.*, No. 04-12-00150-CV, 2012 Tex. App. LEXIS 5470, at *9–10 (Tex. App.—San Antonio July 11, 2012, no pet.) (mem. op.); *In re J.T.G.*, No. 14-10-00972-CV, 2012 Tex. App. LEXIS 430, at *42 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. filed) (mem. op.); *In re M.B.*, No. 12-04-00350-CV, 2005 Tex. App. LEXIS 9939, at *11 (Tex. App.—Tyler Nov. 30, 2005, no pet.) (mem. op.). Therefore, as the Dallas Court of Appeals has done, we assume without deciding that removal for the abuse or neglect of the child is an element under section 161.001(1)(O). *See In re E.S.C.*, 287 S.W.3d 471, 475 (Tex. App.—Dallas 2009, pet. denied sub nom. *Roundtree v. Texas Dep't of Family & Protective Servs.*, No. 09-0653, 2010 Tex. LEXIS 92, at *1 (Tex. App.—Dallas Jan. 15, 2010)). The determination of whether removal was as a result of abuse or neglect is made on a case-by-case basis. *In re A.A.A.*, 265 S.W.3d at 515; *E.S.C.*, 287 S.W.3d at 475; *In re J.T.G.*, 2012 Tex. App. LEXIS 430, at *42.

Here, the undisputed evidence showed that the Department became involved with J.Z. because it received two referrals alleging neglectful supervision and physical abuse. The family service plan, which was admitted as an exhibit at trial, states that the reason for the Department's involvement was the referrals and notes that L.Z. had a history of domestic violence and alcohol abuse. Yupit-Martinez testified that the allegations in the referrals formed the basis of her investigation and that although she ruled out physical abuse, her disposition of the allegation of neglectful supervision due to allegations of alcohol abuse and domestic violence was "reason to believe." Further, the record contains the trial court's temporary order following adversary hearing,

15

which appointed the Department as temporary managing conservator and included the findings required by section 262.201 of the family code.[6]

Viewing the evidence in the light most favorable to an affirmative finding under section 161.001(1)(O), we conclude that there was legally sufficient evidence presented to allow a reasonable factfinder to for a firm belief or conviction that J.Z. was removed from L.Z. for "abuse or neglect." *See In re A.W.B.*, No. 14-11-00926-CV, 2012 Tex. App. LEXIS 2362, at *5–6 (Tex. App. —Houston [14th Dist.] Mar. 27, 2012, no pet.) (mem. op.) (finding sufficient evidence of removal for abuse or neglect where family plan showed case initiated because of referral alleging physical abuse and trial court made findings pursuant to chapter 262 of family code); *In re J.S.G.*, No. 14-08-00754-CV, 2009 Tex. App. LEXIS 3224, at *18–20 (Tex. App.—Houston [14th Dist.] May 7, 2009, no pet.) (mem. op.) (evidence established removal for abuse or neglect where department affidavit stated "concerns" including the parent's criminal history and drug use and trial court made requisite findings under chapter 262); *In re A.C.*, No. 12-04-00264-CV, 2005 Tex. App. LEXIS 8137, at * 11–12 (Tex. App.—Tyler Sept. 30, 2005, no pet) (mem. op.) (evidence established removal for neglect where department testified children were removed because they were believed to be at risk based on report of alleged drug use and lack of appropriate housing and trial court appointed department temporary managing conservator based, in part, on department

---

[6] Section 262.201 requires that following the full adversary hearing, the trial court shall order the return of the child unless it finds sufficient evidence that there was a danger to the physical health or safety of the child caused by the person entitled to possession and for the child to remain in the home is contrary to the welfare of the child; the urgent need for protection required the removal of the child, and reasonable efforts were made to prevent the child's removal; and reasonable efforts have been made to enable the child to return home, but there is a substantial risk of continuing danger if the child is returned. Tex. Fam. Code Ann. § 262.201(b)(1)–(3) (West Supp. 2011).

affidavit concluding there was "reason to believe" report alleging neglectful supervision and physical neglect).

L.Z. contends that *In re S.A.P.* compels the opposite result. In that case, S.A.P. was removed shortly after birth, from the hospital, and there was no evidence of abuse or neglect—or concerns of abuse or neglect—specific to S.A.P. 169 S.W.3d at 689, 706. Rather, the caseworker "unequivocally testified that S.A.P. was not removed for abuse or neglect by [the parents], that S.A.P. was not neglected by [the parents], and that S.A.P. was removed only because of the risk because of [the parents'] prior history" of abuse of their older children. *Id.* at 705–06. In this case, there were allegations of neglectful supervision specific to J.Z. by L.Z. that prompted the Department's investigation and subsequent removal of J.Z. *See In re J.S.G.*, 2009 Tex. App. LEXIS 3224, at *20. Thus, we find *In re S.A.P.* distinguishable and L.Z.'s argument that we must apply its holding to the facts of this case unpersuasive.

### *Substantial compliance with plan*

L.Z. also argues that his parental rights should not have been terminated because he was "really trying to complete the services" and "substantially completed many of the[] service plan tasks." L.Z. offers no authority for his contention that substantial completion can suffice under section 161.001(1)(O), and we have found no authority to support it. To the contrary, as this Court observed in *Bennett v. Texas Department of Family & Protective Services*, "Texas courts have held that substantial compliance is not sufficient to avoid termination for failure to comply with a service plan." No. 03-07-00521-CV, 2008 Tex. App. LEXIS 2420, at *22 (Tex App.—Austin Apr. 3, 2008, no pet.) (mem. op.) (citing *In re T.T.*, 228 S.W.3d 312, 319 (Tex. App.—Houston [14th Dist.] 2007,

17

pet. denied) ("Research reveals that substantial completion or substantial compliance is not enough to avoid a termination finding under this section.")); *see In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (supp. op. on reh'g) ("The Family Code does not provide for substantial compliance with a family services plan."); *see also In re A.A.F.G.*, No. 04-09-00277-CV, 2009 Tex. App. LEXIS 9688, at *8 (Tex. App.—San Antonio Dec. 23, 2009, no pet.) (mem. op.) (section 161.001(1)(O) does not quantify number of provisions of service plan parent must fail to warrant termination or include provision for evaluating partial achievement).

L.Z. testified that he failed to complete aftercare following outpatient treatment, cognitive therapy, and a batterers' intervention program, refrain from criminal activity, and attend three AA or NA meetings a week. In addition, the evidence consistently supported findings that he did not provide stable and suitable housing, cooperate with the Department, or regularly visit with J.Z. Thus, despite L.Z.'s completion of some of the plan's goals, the evidence establishes that he did not achieve much of what was required by the plan. Section 161.001(1)(O) "does [not] quantify the degree of conduct that is deemed a failure as to a particular provision" in the service plan, *In re A.A.F.G.*, 2009 Tex. App. LEXIS 9688, at *8, nor does it "'make a provision for excuses' for a parent's failure to comply with the service plan," *In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.) (quoting *In re T.N.F.*, 205 S.W.3d 625, 631 (Tex. App.—Waco 2006, pet. denied)). We therefore conclude that, viewed in the light most favorable to an affirmative finding under section 161.001(1)(O), there was legally sufficient evidence to allow a reasonable factfinder to form a firm belief or conviction that J.Z. failed to comply with the requirements of the family service plan as required by section 161.001(1)(O).

*Credibility of S.W.*

L.Z.'s third argument in support of his contention that the evidence does not support termination under section 161.001(1)(O) is that "much of the testimony that tends to indicate that the (O) grounds were met came from [S.W.]" and her testimony is "generally not believable" and "tends to indicate that she could be, and probably is lying or exaggerating about . . . any issue involving [L.Z.]." S.W. and L.Z. did offer conflicting testimony regarding some behaviors relevant to L.Z.'s completion of the service plan tasks. However, the trial court is the sole judge of the credibility of the witnesses and the weight to give their testimony; we must defer to the trial court's first-hand assessments of the credibility of the witnesses and conclude that the trial court's assessments could have informed its view of the testimony. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000). "The trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.) (citing *Jeffers v. Wallace*, 615 S.W.2d 252, 253 (Tex. Civ. App.—Dallas 1981, no writ)). Furthermore, as we have already concluded, even without considering S.W.'s testimony, L.Z.'s own testimony constituted legally sufficient evidence to support the trial court's determination that he failed to complete the service plan tasks. We overrule L.Z.'s first issue.

**Best Interest of the Child**

In his second issue, L.Z. contends that the evidence was factually insufficient to support the trial court's finding that termination of his parental rights is in J.Z.'s best interest. *See*

19

Tex. Fam. Code Ann. § 161.001(2). The trial court is given wide latitude in determining the best interest of a minor child. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). The supreme court set out a number of factors for a trial court to consider in determining a child's best interest in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976). Those factors include the (i) desires of the child, (ii) emotional and physical needs of and danger to the child now and in the future, (iii) parental abilities, (iv) plans for the child by the individual or agency seeking custody, (v) programs available to assist the individual to promote the best interest of the child, (vi) stability of the home, (vii) acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (viii) any excuse for the acts or omissions of the parent. *Id.* at 371–72; *see also* Tex. Fam. Code Ann. § 263.307 (West 2008) (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). This list of factors is not exhaustive, not all of them are present in every case, and not all of them need to be proven to determine a child's best interest. *In re C.H.*, 89 S.W.3d at 27; *Holley*, 544 S.W.2d at 372. Further, evidence presented to satisfy the predicate statutory ground finding may also be probative of the child's best interest. *In re C.H.*, 89 S.W.3d at 28; *Pruitt v. Texas Dep't of Family and Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *22–23 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.).

Most of the *Holley* factors are implicated in this case. Although J.Z. was too young to articulate his desires, some courts have considered the quality and extent of the child's relationships with the prospective placements. *See In re J.M.* 156 S.W.3d 696, 706 (Tex.

20

App.—Dallas 2005, no pet.) (considering evidence that children were bonded to foster family, were happy in foster home, and enjoyed visitation with father in assessing young children's desires); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied.) (considering evidence that child was well-cared for by foster family, had bonded with them, and spent minimal time with parent in assessing toddler's desires). Here, the evidence showed that J.Z. has spent most of his life with his foster parents, has bonded with them, considers them to be his parents, is happy, and is doing well with the foster family. The evidence further shows that while L.Z. appears bonded and appropriate with J.Z., he had missed a number of visits with J.Z.—approximately half recently. The only evidence regarding L.Z.'s visitations with J.Z. was that L.Z. seemed appropriate with J.Z. The record contains no evidence of J.Z.'s relationship with L.Z.'s mother, with whom L.Z. intends to place J.Z. if he retains his parental rights, or with Sh.W., whom the record indicates the Department had at one time considered for placement.

Regarding the remainder of the *Holley* factors, it is undisputed that the Department initiated its investigation based on allegations of neglect and physical abuse and found reason to believe the allegations of neglect. The evidence showed that L.Z. made efforts to comply with the family service plan, but it was undisputed that he failed to complete a substantial number of required tasks. It was also undisputed that, because of L.Z.'s history of domestic violence, drug and alcohol abuse, and criminal activity and his recent relapse, he is not a safe parent for J.Z. and that, despite his access to counseling programs through the Department, he cannot provide a stable home for J.Z. and intends for his mother to care for him if he retains his parental rights. Lawrence, L.Z.'s therapist, agreed that L.Z. was not a safe parent for J.Z., testifying that L.Z. successfully completed a protective

21

parenting program but was not using the tools he learned. L.Z.'s pastor testified that he believes L.Z. could be a safe parent with the proper guidance and support system but acknowledged that he has no education in psychology or drug addiction or treatment. Dubin characterized L.Z. as a psychopath who is conning, good at bonding with people with whom he needs to bond, and more interested in winning the case than custody of J.Z. The evidence further showed that the foster family provides a safe, stable, and caring environment and plans to nurture the needs and interests of J.Z. if allowed to adopt him. L.Z.'s mother testified that if J.Z. were to live with her, she would work with the foster family and allow L.Z. and S.W. access only if they were clean and sober. Although photographs of L.Z.'s mother's home were admitted into evidence, there was no evidence of her parenting abilities, home stability, or plans for J.Z. other than as to visitation. The only evidence as to Sh.W.'s abilities or plans was testimony that she had abused S.W. and displays emotional behavior.

In light of the entire record, the trial court reasonably could have credited the undisputed evidence and testimony of L.Z., the foster father, the Department's investigator and caseworker, and L.Z.'s therapist and psychologist, as well as the disputed testimony of S.W., and could have reasonably formed a firm belief or conviction that termination of L.Z.'s parental rights was in J.Z.'s best interest. *See In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 23. L.Z. contends that the trial court could not have had a firm conviction that termination was in J.Z.'s best interest because the court expressed concerns regarding J.Z.'s continued contact with L.Z.'s mother if he were adopted by the foster family. L.Z. cites no authority for this argument, and we do not find it persuasive. The record shows that in terminating L.Z.'s parental rights, the trial court expressly

stated that it did not intend to inhibit post-termination contact with J.Z.'s extended family, in particular with L.Z.'s mother. However, the trial court's comments regarding the effects of termination on J.Z.'s contact with L.Z.'s mother have no bearing on its determination that termination of L.Z.'s parental rights was in the best interest of J.Z. We therefore conclude that there was factually sufficient evidence to support the trial court's best interest finding in favor of termination. *See In re H.R.M.*, 209 S.W.3d at 108; *In re J.F.C.*, 96 S.W.3d at 266. We overrule L.Z.'s second issue.

## CONCLUSION

Having overruled L.Z.'s issues, we affirm the trial court's order of termination.

_____

Melissa Goodwin, Justice

Before Justices Puryear, Henson and Goodwin

Affirmed

Filed:   August 23, 2012