**DISSENT; and Opinion Filed August 28, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-00951-CV

**D MAGAZINE PARTNERS, L.P. D/B/A D MAGAZINE, MAGAZINE LIMITED PARTNERS, L.P., AND ALLISON MEDIA, INC., Appellants**

**V.**

**JANAY BENDER ROSENTHAL, Appellee**

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-01346-G**

## DISSENTING OPINION
Opinion by Justice Brown

The majority affirms the trial court's refusal to dismiss appellee's libel claim pursuant to the Texas Citizens Participation Act (TCPA). I would conclude appellee has failed to establish by clear and specific evidence that the gist of this article is false. Accordingly, I would reverse the trial court's order, and I must respectfully dissent.

### Background

To recover for libel, a plaintiff must prove (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) in most cases, damages. *See In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). A motion to dismiss under the TCPA triggers a two-step inquiry. First, the defendant-movant has the initial burden to show by a preponderance of the evidence that the plaintiff's claim "is based on, relates to, or is in response to the party's exercise" of free speech, right to petition, or right of

association. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)(1)–(3) (West 2015); *Lipsky,* 460 S.W.3d at 586. In this case, appellee does not dispute that the article implicates appellants' exercise of free speech, which is defined in the statute to mean "a communication made in connection with a matter of public concern." *Id.* § 27.001(3). A "matter of public concern" is defined, in turn, to include an issue related to (a) health or safety; (b) environmental, economic, or community well-being; (c) the government; (d) a public official or public figure; or (e) a good, product, or service in the marketplace. *Id.* § 27.001(7).

Given that the parties agree the TCPA applies, the statute's second inquiry shifts the burden to the plaintiff to establish, by clear and specific evidence, a prima facie case for each essential element of her claim. *Id.* § 27.005(c); *Lipsky,* 460 S.W.3d at 587. In determining whether the plaintiff's claims should be dismissed, the court is to consider the pleadings and any supporting and opposing affidavits. TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a); *Lipsky,* 460 S.W.3d at 587.

The majority has carefully set forth the substance of the article before us. It is a one-page piece: a quick introductory paragraph assuring the Park Cities reader that she too can qualify for food stamps if only she follows appellee's five-step plan; followed by five short columns, each headed by the author's directive for those wishing to take advantage of the food-stamp system despite living in the wealthy enclave of the Park Cities. The reader is instructed to (1) know the system, (2) move in with your boyfriend, (3) say you are head of the household, (4) keep your job, and (5) commit only minor crimes. There is no dispute as to what the article says. But I cannot agree with what the majority says it implies.

### The Gist of the Article

The Texas Supreme Court has instructed that the meaning of a publication, and therefore whether it is false and defamatory, depends upon a reasonable person's perception of the entire

publication, not merely individual statements within it. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000). A defamation plaintiff must prove that the publication's "gist" is false and defamatory in order to prevail. *Id.* Thus, the critical starting point for our analysis is framing the gist of the article at issue.

As the majority states, the parties disagree on this point. Appellants assert the gist of the article is that appellee, who had a criminal history of theft, was receiving food-stamp benefits while living in a $1.15 million home in the Highland Park Independent School District (HPISD). Appellee asserts the gist of the article is that she committed welfare fraud in applying for and receiving food stamps. The majority concludes that both parties are right, stating:

> We conclude that the gist is actually a combination of appellants' and appellee's statement of the gist. A reasonable person would conclude the article was a criticism of the SNAP benefits system that allowed appellee, who had been convicted of theft, to receive benefits [1] while living in a $1.15 million home and [2] while defrauding HHSC by filing false information with HHSC.

Unfortunately, this effort at being conciliatory appears to produce an internally inconsistent understanding of the essence of the article. That essence, according to the majority, is a criticism of a system that allows benefits under two conditions, one of which is the beneficiary's lavish living arrangements, the other of which is defrauding that same system. The majority's statement clearly places criticism of the food-stamp system at the threshold. And the statement's first condition—the lavish living quarters—speaks to that criticism. But the second condition— commission of welfare fraud—does not speak to criticism of a broken system. It speaks, instead, to a person with felonious intent, someone purposefully violating a well-founded legal system. The focus of the two conditions is entirely different and, I believe, contradictory. Either the article suggests appellee could use the system to her advantage or it suggests she set out to cheat the system.

I agree, in essence, with appellants' statement of the gist of this article. I believe the structure, the tone, and the substance of the article would lead an ordinary reader to conclude the piece is a satirical critique of a benefits system that allows a woman with a criminal history of theft, living in a million-dollar home, and taking advantage of the highly rated school system of a wealthy enclave, to collect food stamps. *See id.* at 114 ("a publication's meaning depends on its effect on an ordinary person's perception").

Again, the article is only one page long. As the majority describes, the headline and opening paragraph of the article are balanced on the page by a graphic showing appellee's theft mug shot surrounded by an ornate, golden frame. The five columns, each headed by its basic instruction, are topped by large graphic numbers—one through five—inside dark circles. The page is not structured as an investigative article or editorial. Instead, the reader's visual impression, overall, is of a "how-to" piece with step-by-step instructions for the project at hand.

The tone of the article underscores its satirical purpose. An ordinary person reading the opening paragraph would "hear" the tone immediately:

> Who wouldn't like some extra spending money each month? Cash for those little treats at Whole Foods and Tom Thumb? Well, it can be yours with just a little effort. All you have to do is apply for food stamps. What's that, you say? You live in the Park Cities and would never qualify? Hogwash. Just have a look at how 40-year-old University Park mom Janay Bender Rosenthal pulls it off.

A generous characterization of the author's invitation is tongue-in-cheek; a less generous characterization might be snide. In either case, the author's tone is hardly that of an investigative reporter. And the author's diction—employing rhetorical questions, conversational slang, and contractions throughout—reads like a casual chat; the author virtually winks at the reader as she explains how to game the broken system.

Finally, the substance of the article, especially viewed within its structure and tone, persuades me its primary purpose was to critique the food-stamp benefits system. In fact, the

author's first directive is "Know the System." We come to learn the system allows the kind of windfall appellee purportedly has received: the author's point, thus, is that her reader should *use* the system, not defraud it. And as we read on, we learn many obvious shortcomings of the system. The author tells us we cannot know what appellee told the Health and Human Services Commission (HHSC) because "[i]nformation about individuals receiving aid is not publicly available," but we are repeatedly given information about appellee's aid that the author received from employees of the HHSC. The system, apparently, has a number of leaks. We see that changes in a beneficiary's status or living arrangements are not investigated by the HHSC. We are told that the documents necessary to qualify for benefits are not necessary to renew those benefits every six months.[1] And, as the climax to the article, we learn that a criminal history of theft is not problematic in the award of benefits because the system "only check[s] for felony drug convictions." It is true that the author uses appellee and her receipt of benefits to illustrate these various points. But I believe the ordinary reader would finish this article harboring more concerns about the food-stamp system than she would about appellee.

Again, the premise of the majority's statement of the gist of the article—arguably the gist of the majority's gist—is likewise a criticism of the food-stamp benefits program. Appellee has agreed, after all, that the article implicates "a matter of public concern." TEX, CODE CIV. PRAC. & REM. ANN. § 27.001(3).[2] But the majority goes on to append its conclusion that the article also implies welfare fraud on appellee's part. The opinion explains this conclusion by contending that appellants' statement of the gist of the article does not account for the article's headline, "The Park Cities Welfare Queen," or the magazine's categorization of the article as

[1] In a later version of the article posted online, this point was corrected after appellants received information from HHSC that it did check documents at renewal.

[2] The majority includes two of the possible bases for public concern in its statement of the law: environmental, economic, or community well-being and the government. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7)(B), (C). It is difficult to see how the article could fall within either of these categories unless its emphasis is upon the food-stamp program.

[Crime]. I disagree that either of these components of the article justifies an implication of criminal fraud.

The majority's discussion of the term "welfare queen" begins with the unsupported assertion that there are two and only two possible definitions for the term. From that premise it reasons that because the evidence establishes appellee is not "a person who remains legally qualified for benefits by having children out of wedlock and avoiding marital relationships," she must be a woman "who is committing fraud to receive government-assistance benefits illegally." In a footnote, the majority cites to Wikipedia, slate.com, and a New York University law review article to summarize the history of the term "welfare queen," but nothing in the footnote justifies the opinion's absolute limitation on this term's possible meanings. I do not question that the term "welfare queen" is pejorative or that the author uses it to refer to appellee in this case. However, I submit that when we consider the tone and substance of this piece, a rational reader could certainly conclude the term's meaning is spelled out in the subheading found immediately below the "Park Cities Welfare Queen" headline: the "University Park mom [who] has figured out how to get food stamps while living in the lap of luxury." This reading comports with appellants' statement of the gist of the article being a tongue-in-cheek recipe for how to obtain food stamps even if you live in an expensive home in a wealthy area.

The majority also contends appellant's statement of the gist of the article does not account for its placement in the magazine's [Crime] section. But part of the author's argument is rooted in the system's lack of interest in an applicant's criminal background. The majority argues this concern is only the gist of one of the five-step directives. However, the majority includes the phrase "who had been convicted of theft" in its own statement of the gist of the article. Appellee's criminal history—and the HHSC's lack of concern about such a history—is a

part of this story.  It is not unreasonable that when placing the article within the magazine, editors decided on the [Crime] section.

I do not believe it is reasonable to infer a charge of welfare fraud from appellants' use of the term "Park Cities Welfare Queen" or the magazine's placement of this story.  I would conclude that the gist of the article is a satirical critique of a benefits system that allows a woman with a criminal history of theft, living in a million-dollar home, and taking advantage of the highly rated school system in that wealthy enclave, to receive food stamps.

### Truth or Falsity of the Article

The majority concludes that appellee established by clear and specific evidence that she did not commit welfare fraud.  Because I do not agree that welfare fraud was the gist of the article, I cannot agree that this proof was sufficient to avoid dismissal.  Instead, I would ask whether appellee established the falsity of the article's criticism of the food-stamp system and of appellee as its beneficiary.

The majority states that we may consider only appellee's evidence in determining whether she carried her burden.  However, the TCPA instructs that in determining whether the plaintiff's claim should be dismissed, the court is to consider the pleadings and any supporting and opposing affidavits. TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a) ("In determining whether a legal action should be dismissed under this chapter, the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based."); *see also Lipsky*, 460 S.W.3d at 587.  If the majority is correct, and we are to consider only the plaintiff's evidence in judging whether she has met her burden to establish each element of her claim, and to consider only the defendant's evidence in judging whether it has met its burden to prove an affirmative defense, then the statutory directive to consider "opposing affidavits" would be rendered meaningless.  We must not interpret a statute in a

–7–

manner that renders any part of the statute meaningless or superfluous. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008). I would conclude that the plain language of the statute intends us to consider all the evidence when determining whether appellee has carried her burden in this case. And when we review all the evidence before the trial court, I would conclude appellee failed to prove by clear and specific evidence the gist of the article: that she did not have a criminal history of theft, that she did not live in a million dollar house with her boyfriend, that her daughter was not attending a HPISD school, and that she was not receiving food stamps. All of those statements, which make up the essence of the article, were true.

Appellee's response to the motion to dismiss included a list of statements that she alleged were false, and she urges those points in this Court as well. Again, it is the gist of the publication that must be judged for truth or falsity. *Turner*, 38 S.W.3d at 115. But appellee also failed to establish that specific factual statements in the article were actionably false. By way of example:

- Appellee takes issue with the article's mention of her "convictions," because after she was arrested for theft twice as an adult and pleaded either no contest or guilty, she was fined and received community supervision and deferred adjudication. The average reader would understand this information as an issue of guilt, not whether appellee ultimately avoided a conviction on her record. I would conclude the statement that appellee was arrested and convicted for theft was substantially true. *See McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990) ("The test used in deciding whether the broadcast is substantially true involves consideration of whether the alleged defamatory statement was more damaging to [the plaintiff's]

reputation, in the mind of the average listener, than a truthful statement would have been.").

- Appellee contends the article falsely accused her of hiding assets by making reference to her connection to households that were in fact undeveloped lots, held in trust for appellee's daughter by appellee's brother. Of course, appellee's daughter, who was a party to this suit initially, was part of appellee's household. Appellee contends she had no knowledge of the properties, and the article does not say she did. Moreover, appellee argues the trust included only eight properties, not nine as the article stated. "Discrepancies as to details do not demonstrate material falsity for defamation purposes." *Ruder v. Jordan*, No. 05-14-01265-CV, 2015 WL 4397636, at *4 (Tex. App.—Dallas July 20, 2015, no pet. h.) (mem. op.).

- Similarly, appellee asserts that her boyfriend's home is located in Dallas, not University Park as the article states. The evidence indicates the home is within a block of University Park's boundary and, more importantly, within the highly acclaimed HPISD. Thus, when her daughter was attending school in the Park Cities—as the article asserts—appellee was taking advantage of her home address in a significant way. The article's assertion that the home was located in University Park was substantially true. *See id.*

- Appellee also complains of the article's statement that she "must have been less than forthcoming" in the information she gave the HHSC when renewing her benefits. She states she truthfully identified her mailing address in her application. However, the benefits application also asks the applicant for her home address. The evidence establishes that appellee and her daughter were

living with her boyfriend at the time of renewal, but appellee does not testify that she informed the HHSC of her home address when she renewed her benefits. If appellee left the home-address space blank, allowing the HHSC to infer that her home address was the same as her mailing address, then she clearly was less than forthcoming in her dealings with the agency. I would conclude appellee failed to prove this statement was false as well.

It is undisputed that the author used appellee to illustrate her case against the food-stamp system, but none of these statements charged appellee with welfare fraud. The article does not flatter appellee, and it is not kind toward her. But it is not false. "A publication with specific statements that err in the details but that correctly convey the essence of a story is substantially true and not actionable." *AOL, Inc. v. Malouf*, No. 05-13-01637-CV, 2015 WL 1535669, at *4 (Tex. App.—Dallas Apr. 2, 2015, no pet.) (mem. op.).

I would conclude that appellee failed to establish her libel claim's key element of falsity by clear and specific evidence. Accordingly, I would sustain appellants' first issue. I would reverse the trial court's order and render judgment dismissing appellee's libel claim. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c).[3]

## Attorney's Fees and Costs

If we sustained appellants' first issue, we would address their third issue concerning the TCPA's mandatory award of attorney's fees and costs when a plaintiff's claim is dismissed. I would sustain appellants' third issue and remand the case for determination of these matters in accordance with the TCPA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a).

---

[3] If we did sustain this issue, we would not need to address appellants' second issue concerning their affirmative defenses.

**Conclusion**

Appellee's burden was to establish a prima facie case of each element of her libel claim by clear and specific evidence. She was unable to establish that the gist of the article was false or that any of the key statements in the article were false. Because she failed to carry her burden under the TCPA, the trial court should have dismissed her claim. I would reverse the trial court's order, render judgment dismissing appellee's claims, and remand the cause to the trial court for a determination of costs, attorney's fees, and other expenses as authorized by statute.


/Ada Brown/
ADA BROWN
JUSTICE

140951DF.P05